THE STATE OF FLORIDA *ex rel.*, RIVERS BUFORD, ATTORNEY GENERAL, *Plaintiff in Error*, v. RICHARD P. DANIEL *et al.*, AS MEMBERS OF THE COUNTY WELFARE BOARD OF DUVAL COUNTY, FLORIDA, AND COUNTY WELFARE BOARD OF DUVAL COUNTY, FLORIDA, *Defendants in Error*.

Opinion Filed March 19, 1924.

1. Chapter 9274, Acts of 1923, is an Act providing for a public administrative agency, viz: a County Welfare Board in counties of the State having a population of over 100,000, and the subject of the act is sufficiently expressed in its title to comply with Section 16, Article III of the Constitution.

2. The provision of Chapter 9274, that the County Welfare Board shall be composed of "five men and four women who are qualified electors of the county," does not illegally curtail the Governor's power of selection, so as to violate Section 27, Article III of the Constitution.

3. Classifications of counties for governmental purposes based upon population is permissible in enacting general laws.

4. The Constitution is not violated by a statutory provision that the County Commissioners shall levy a tax in an amount fixed by other county officers when the statute itself authorizes such other county officers to fix the amount within a stated limit.

5. Chapter 9274, Acts of 1923, does not violate Sections 20 and 21, Article III of the Constitution.

A Writ of Error to the Circuit Court for Duval County; Daniel A. Simmons, Judge.

Affirmed.

*J. T. G. Crawford,* for Plaintiff in Error;

*E. J. L'Engle, George M. Powell, George C. Bedell, A. W. Cockrell Jr., P. H. Odom, Martin W. Long* and *Richard P. Daniel,* for Defendant in Error.

## STATEMENT.

An information in the nature of *Quo Warranto* filed in the Circuit Court by the Attorney General contains allegations as follows:

"Comes now the State of Florida, on the relation of Rivers Buford, Attorney General of the State of Florida, and gives the said court here to understand and be informed that Richard P. Daniel, Robert H. McGinnis, Howard E. Harkisheimer, Waldo E. Cummer, John D. Baker, Mrs. Mamye S. Corbett, Mrs. Nellie L. Berlack, Mrs. Annie I. Broward and Mrs. Edith Griffin, all of said Duval County, State of Florida, for some time last past have held, used and exercised, and still do hold, use and exercise, severally, the office of Member of the County Welfare Board of Duval County, Florida, and, collectively, pretend to constitute the County Welfare Board of Duval County, Florida, claiming to hold their said offices and to constitute said County Welfare Board and to exercise the pretended powers thereof under color of a certain Act of the Legislature of the State of Florida entitled: 'An Act Creating a County Welfare Board for each County Having a Population of over one Hundred Thousand, Prescribing its Powers and Duties; Providing for its Financial Support and Providing for the Qualifications of its Members and Repealing Chapters 7336 and 8535, Laws of Florida;' that the said Respondent County Welfare Board of Duval County, Florida, under color of said

Act entitled as aforesaid, has heretofore and is now pretending to act as a corporation, claiming the right to sue and to contract and to acquire and dispose of property as a corporation; that the said respondents claiming the right so to do under the terms of said Act entitled as aforesaid, have directed the Board of County Commissioners of said Duval County, Florida, to levy a tax upon all the real and personal property in said County of three mills; and that said tax upon the assessed valuation of said property for the current year amounts to approximately two hundred thousand dollars; that the said act entitled as aforesaid is void and of no effect in the following particulars, that is to say:

"1. The attempted limitation upon the power of the Governor to appoint the members of said Board in the provision that said Board shall be composed of five men and four women is in conflict with Section 27 of Article III of the Constitution; and said provision is an attempted exercise by the legislative department of the State of a power conferred solely upon the executive department by Article II of the Constitution.

"2. The title of said Act does not sufficiently express or indicate the subject matter thereof to meet the requirement of section 16 of Article III of the Constitution.

"3. The attempted repeal of Chapters 7736 and 8535 laws of Florida by reference thereto in the title of said Act by chapter numbers only, without any indication or description of the subject matter or subject matters of said chapters, is not a sufficient compliance with the requirement of section 16 of Article III of the Constitution to effect a repeal of said chapters.

"4. By the said Act the Legislature has attempted to authorize the said Board to, in effect, levy taxes for the purpose of providing for persons not inhabitants of the

said county, contrary to section 5 of Article IX and Section 3 of Article XIII of the .Constitution.

"5.  By the said Act the Legislature has attempted to authorize the said Board to, in effect, levy taxes for the purpose of providing for persons who. do not, by reason of age, infirmity or misfortune have claims upon the aid and sympathy of society, contrary to Section 5 of Article IX, and Section·3 of Article XIII of the Constitution.

"6.  By the said Act the Legislature has attempted to authorize the said Board to conduct, operate and maintain a general hospital and to, in effect, levy taxes for said purpose, contrary to Section 5 of Article IX, and Section 1 and 3 of Article XIII, and Article XV of the Constitution.

"7.  The powers attempted to be conferred upon said Board next hereinbefore enumerated, and the attempted grant of authority to, in effect, levy taxes to enable said Board to exercise said powers is prohibited by Section V of Article IX of the Constitution.

"8.  The provision of Section 3 of Article XIII of the Constitution is a direct grant of power to the counties of the State and can only be exercised by the Boards of County Commissioners of the respective Counties 'in the manner' prescribed by the legislature.

"9.  The Constitution provides for a Board of County Commissioners in the respective counties who are general administrative officers of the county and impliedly prohibits the legislature from conferring upon others any of the powers and duties usually exercised by such Board of County Commissioners as is attempted by said Act.

"10.  The provision of said Act that said Board shall be a corporation is in violation of Section 25 of Article III of the Constitution.

"11. The said Act is a special or local law within the meaning and intent of the clauses of Section 20 of Article III prohibiting such laws regulating the jurisdiction and duties of any class of officers except municipal officers, and providing for the assessment and collection of taxes for State and County purposes.

"WHEREUPON the said relator prays the advice of this court in the premises, and for due process of law against the said respondents in this behalf requiring the said respondents to answer by what warrant they claim to hold, use and exercise the aforesaid offices, powers and franchises."

The respondents demurred and moved to quash the information on the ground that the statute referred to in the information, Chapter 9274, Laws of 1923, "is not obnoxious to the Constitutional provisions set forth in said information."

The court sustained the demurrer and granted the motion to quash the information, and rendered final judgment as follows:

"This cause coming on this day to be further heard, and the relator having announced to the Court that he would not amend the information in the nature of a quo warranto heretofore filed herein, and the Court being of the opinion that the said information does not make or state a cause entitling the relator to the relief prayed, and being advised of its judgment herein, it is thereupon finally

"ORDERED, that the individual respondents as members of the County Welfare Board of Duval County, Florida, do rightfully and lawfully severally hold office as members of said County Welfare Board of Duval County, Florida, and that the corporate respondent is rightfully

and lawfully enjoying and exercising its corporate franchises."

A Writ of Error was taken by the Relator.

The statute asserted to be unconstitutional is as follows:

"CHAPTER 9274—(No. 156).

"AN ACT Creating a County Welfare Board for Each County Having a Population of Over One Hundred Thousand; Prescribing its Powers and Duties; Providing for its Financial Support and Providing for the Qualifications of its Members, and Repealing Chapters 7336 and 8535, Laws of Florida.

"*Be It Enacted by the Legislature of the State of Florida*:

"Section 1.   There is hereby created a County Welfare Board in each County of Florida having a population of over one hundred thousand according to the last Federal Census.   Such Board shall consist of nine members, composed of five men and four women who are qualified electors in the county in which said Board is created.   Members of said Board shall be appointed by the Governor and their terms of office shall be for four years and until their successors are appointed and qualified, except that the first board appointed under this Act, four members thereof shall be appointed for the term of two years and five members thereof shall be appointed for the term of four years, except that in the case of an appointment to fill a vacancy, in which case appointment shall be for the unexpired term.   The Governor shall have the power to remove any member of such Board for cause and shall fill

any vacancies that may at any time occur therein. Each
member shall give bond to the Governor for the faithful
performance of his or her duties in the sum of Five Thou-
sand Dollars with a surety company qualified to do busi-
ness in the State of Florida, as surety, which bond shall
be approved and kept by the Board of County Commis-
sioners for such County in which such County Welfare
Board may be created. The premiums on said bonds shall
be paid as a part of the expenses of said County Welfare
Board.

"Sec. 2.  Such County Welfare Board shall: (a) Pro-
vide for those of the inhabitants of its County who by
reason of age, infirmity or misfortune have claims upon
the aid and sympathy of society; (b) Furnish tempor-
ary relief to the indigent and study the cause of their pov-
erty and seek a plan for their permanent rehabilitation, and
generally, to assist them to support themselves, whenever
possible, to the end that they may cease to be a charge
upon the community, and instead, become useful citizens
thereof; (c) Bury the indigent dead of the County and
provide cemeteries for that purpose; (d) Conduct,
operate and maintain a general hospital, clinic and out-
patient department in such County for the medical and
surgical diagnosis and treatment of human diseases of
all kinds; (e) Purchase and lease lands in its corporate
name within the corporate limits of such county and lease,
construct, purchase and or equip such buildings and im-
provements thereon as may be necessary or convenient for
use in carrying out the purposes, or any of them, for which
such board is created.

"Sec. 3.  Every hospital and clinic established under
this Act shall be for the use and benefit of the indigent
sick who have resided in such county for not less than one
year next preceding application for admission for treat-

ment. Such residents shall be admitted to such hospital and clinic and be entitled to occupancy, nursing, care, medicine and attendance without charge, subject to the rules and regulations prescribed by said County Welfare Board. Such hospitals and clinics shall care for and treat without charge patients who are found by such Board to be indigent, but such Board may collect from patients financially able such charges as such Board may from time to time establish. Such board shall have the power to extend the benefits and privileges of such hospitals and clinics and treatment through an out-patient department to the homes of the indigent residents of such county. Said Board may extend the privileges and use of such hospitals and clinics to non-residents of such County upon such terms and conditions as the said Board may from time to time by its rules and regulations provide, provided however, that the indigent residents of the County wherein such hospitals and clinics are located shall have the first claim to admission.

"Sec. 4. Such County Welfare Board shall file with the Board of County Commissioners for the County in which the Welfare Board may be created, a quarterly report, including a statement of their expenditures during the next preceding quarterly period. Such County Welfare Board shall also make to the Governor an annual report of its family welfare work and its hospital work, including the number of patients, various sums received from taxes and other sources, and how and for what purpose such moneys have been expended.

"Sec. 5. The members of such County Welfare Boards shall serve without compensation, but such Boards shall have the power to employ paid assistants, and to pay such necessary expenses incurred by said Board as the proper performance of its functions may require.

"Sec. 6. Such County Welfare Board shall annually elect one of its members chairman and such other officers as it may deem wise. They shall make and adopt such by-laws, rules and regulations for their own guidance and for the government of their activities as may be expedient. They shall keep minutes of their proceedings and shall hold regular meetings at least once a month. Said County Welfare Boards are authorized to receive and administer donations by private parties for use in the furtherance of the purposes for which such Board is created. It shall be the duty of the County Commissioners in such County where such Board shall be created to levy an annual tax on all real and personal property in such county in an amount to be fixed by said Welfare Board, which amount, however, shall never exceed three mills on the total assessed valuation of such county. The Tax Collector of such county shall, as and when collected, deposit all moneys collected under the tax hereby created to the credit of such County Welfare Board in a bank or banks to be designated by such Welfare Board.

"Sec. 7. Each County Welfare Board created and existing under this Act shall be a corporation with power to adopt a corporate seal, sue and to contract, to acquire and dispose of property, both real and personal, and do every other act and thing necessary to the discharrge of its duties and functions.

"Sec. 8. All property, real, personal and mixed, now owned, leased or controlled by any County Boards of Charities and County Boards of Tuberculosis Commissioners now created or existing under and by virtue of Chapter 7336, Laws of Florida, Acts of 1917 and Chapter 8535, Laws of Florida, Acts of 1921, upon the effective date of this Act, shall vest in and become the property of the County Welfare Board of the county wherein such

County Board of Charities and such Board of Tuberculosis Commissioners are located and functioning. Such County Welfare Boards shall thereupon assume all the financial obligation of such Charities and Tuberculosis Boards.

" Sec. 9.  Such County Welfare Board shall have the power, and it shall be its duty, to employ a County Physician or Physicians at a salary or salaries to be fixed by the Board, whose duties shall be to visit, attend and prescribe treatment for the indigent sick of the county at their homes, and such other places as may be designated by such County Welfare Board.

"Sec. 10.  This Act shall not be construed to affect or impair, in any manner Chapter 7920, Laws of Florida, providing for assistance for poor mothers, which shall remain in full force and affect.

"11.  Chapters 7336 and 8535, Laws of Florida, and all laws or parts of laws in conflict herewith are hereby repealed.

"12.  This Act shall take effect on July 1st, 1923.

"Approved May 30, 1923.

WHITFIELD, J., (*after stating the facts.*)

In quo warranto proceedings the Attorney General challenges the Constitutional validity of Chapter 9274, Acts of 1923, the various contentions made will be discussed without unnecessary repetition of the grounds of asserted invalidity that are set out in full in the statement.

The requirement of Section 16, Article III of the Constitution is that each law "shall embrace but one subject and matter properly connected therewith, which subject shall be briefly expressed in the title." As the subject of the Act set out in the statement is the creation of a

280     SUPREME COURT OF FLORIDA.

State ex rel. Buford v. Daniel et al.—Opinion of Court.

County Welfare Board for each county having a population of over one hundred thousand, with provisions defining the powers and duties and providing for the financial support of such Board and prescribing the qualifications of the members thereof, and as that subject is expressed in the title, it is immaterial that the portion of the title reading "and repealing Chapters 7336 and 8535, Laws of Florida." does not express the subject of the Acts to be repealed, since such repeal is "matter properly connected" with the subject expressed in the title, and such matter need not be expressed in the title, but the repeal is effective because of conflicting provisions contained in the Act with or without reference in the title to the express repeals contained in the body of the Act. See State ex rel. Attorney General v. Knowles, 16 Fla. 577; State ex rel. McQuaid v. Commissioners of Duval County, 23 Fla. 483, 3 South. Rep. 193.

The rule that in amending statutes the subject of the amending statute is not sufficiently expressed in the title which contains only the section number of the statute that is to be amended may not apply to provisions in the body of an Act that expressly repeal other statutory provisions; and provisions expressly repealing prior statutes may be immaterial where such prior statutes are repealed by implication because inconsistent with the new law. The statutes repealed are of kindred nature to the new statute enacted to supersede the repealed statutes.

While the title of an Act is by the Constitution required to briefly express the subject of the enactment, it need not state matters properly connected with such subject that are embraced in the body of the law; and the language used in expressing the subject of the enactment is within the legislative discretion. If the language of the title considered with reference to the legislative intent

as shown by the purpose and object of the Act, may by any fair intendment cover the subject of the Act, the Courts will not because of an asserted defective title refuse to give effect to any matter contained in the body of the enactment that is germain to or properly conected with the subject of the law, where the title is not so worded as to mislead an ordinary mind as to the real purpose and scope of the particular enactment. A wide latitude must of necessity be accorded the Legislature in its enactments of law; and it must be a plain case of violating the requirements of the organic law as to titles of Acts before the courts will nullify statutes or portions thereof as not being within the purpose and scope of the subject as expressed in the title and of ''matter properly connected therewith.'' If the title of an Act fairly gives notice of the subject of the Act so as to reasonably lead to an inquiry into the body thereof, it is all that is necessary. The title need not be an index to the contents of the Act. Butler v. Terry, 67 Fla. 405, 66 South. Rep. 150.

When a matter is so closely connected with the subject of the Act as to create a doubt whether it is not included within, the courts will not consider the question whether the legislative action upon it violates the constitutional prohibition relating to the titles of laws. County Commissioners of Duval County v. City of Jacksonville, 36 Fla. 196, 18 South. Rep. 339.

When the title is general the Legislature must be considered as put upon notice as to anything in the bill germane to the subject expressed. State ex rel. Gonzalez v. Palmes, 23 Fla. 620, text 629, 3 South. Rep. 171.

The conflict between the Constitution and a Statute must be palpable, to justify the judiciary in disregarding the latter upon the sole ground that it embraces more than one subject, or that, if there be but one, it is not suffi-

ciently expressed in the title. Montclair v. Ramsdell, 107 U. S. 147, 2 Sup. Ct. Rep. 391.

The generality of the title of a statute does not invalidate it so long as the title is comprehensive enough to reasonably include within the general subject or the subordinate branches thereof, the several objects which the statute seeks to effect. and does not cover legislation incongruous in itself· and which by no fair intendment can be included as having any necessary and proper connection. Blair v. Chicago,. 201 U. S. 400, text 401, 26 Sup. Ct. Rep. 427; Hoboken v. Pennsylvania R. Co., 124 U. S. 656, 8 Sup. Ct. Rep. 643; Jonesborough City v. Cairo & St. L. R. Co., 110 U. S. 192, 4 Sup. Ct. Rep. 67; State *ex rel.* Gonzalez v. Palmes, 23 Fla. 620, text 628, 3 South. Rep. 171.

The constitutional requirement is not directed against the generality and comprehensiveness of titles; all its purposes are satisfied when the law has but one general subject or object which is fairly' indicated in its title. So long as the generality of the title is not made a cover for legislation incongruous in itself, and the title is not misleading or deceptive but fairly expresses the general subject or object of the law, the mere generality of the title is not an objection. 25 R. C. L. pp. 853, 854, Sec. 99; Holton v. State, 28 Fla. 303, 9 South. Rep. 716; Schiller v. State, 49 Fla. 25, 38 South. Rep. 706; Ex Parte Gilletti, 70 Fla. 442, 70 South. Rep. 446; Ex Parte Pricha, 70 Fla. 265, 70 South. Rep. 406; Saussy v. Davidson, 75 Fla. 422, 78 South. Rep. 336; State v. Henry, 15 La. Ann. 297; 29 Fla. 408.

The Act provides for a public administrative agency and the title is a sufficient compliance with the organic requirement, since it is ample to put upon enquiry all who may be interested in the public matters of the county that may be included in provisions relating to public wel-

fare of any nature or kind. See State *ex rel.* Hopkins v. Howat, 109 Kan. 376, 198 Pac. Rep. 686, 25 A. L. R. 1210. The title is not misleading as in Webster v. Powell, 36 Fla. 703, 18 South. Rep. 441; and in Brooks v. Hydron, 76 Mich. 273, 42 N. W. Rep. 1122. The generality of the title is not deceptive. See Public Service Co. v. Recktenwald, 290 Ill. 314, 125 N. E. Rep. 271, 8 A. L. R. 466; Perkins v. Board of County Commissioners, 271 Ill. 449, 111 N. E. Rep. 580, Ann. Cas. 1917-A 27; 25 R. C. L. 854. The statute is not incongruous.

The general provision of Article II of the State Constitution that the powers of government shall be divided into three departments, and that no person properly belonging to one of the departments shall exercise any power appertaining to either of the others, except in cases expressly provided for by the Constitution, may not make the appointment of officers an exclusively executive power or function; and unless other organic provisions control, the legislative department may exercise itself or authorize officers of either of the other departments to exercise the power to appoint statutory officers and may make such authority restrictive or absolute, within organic limitations. See 12 C. J. 898, Sec. 402; Ingard v. Baker, 27 Idaho 124, 147 Pac. Rep. 293; Richardson v. Young, 122 Tenn. 471, 125 S. W. Rep. 664; Little v. Williamon, 103 S. C. 50, 87 S. E. Rep. 435. Where the Constitution in express terms confers upon the Governor the power to appoint all officers that may be appointed and are not otherwise provided for by the Constitution or by laws made pursuant to constitutional authority on the particular subject, the Legislature may properly prescribe the qualifications of those who may be appointed to statutory offices, but it cannot directly or indirectly, or under guise of prescribing qualifications or otherwise, unduly limit or

encroach upon the power of the Governor to appoint offi-
cers to fill statutory offices; and the provisions as to quali-
fications must not violate any controlling provision of law.
The Legislature cannot under our Constitution authorize
any other person or authority to participate in selecting
or to hamper the exercise of executive judgment in mak-
ing selections for appointments to office. See Westlake v.
Merritt, 85 Fla. 27, 95 South. Rep. 662; State v. Wash-
burn, 167 Mo. 680, 67 S. W. 592, 90 Am. St. Rep. 430;
State ex rel. Harvey v. Wright, 251 Mo. 325, 158 S. W.
823, Ann. Cas. 1915-A 588; 12 C. J. 837.

The provision of the statute that "such Board shall con-
sist of nine members, composed of five men and four
women who are qualified electors of the county in which
said Board is created" does not violate the organic pro-
vision that "the Legislature shall provide for the election
by the people or appointment by the Governor of all
State and County officers not otherwise provided for by
this constitution," for the reason that in creating the
office the Legislature may prescribe the qualifications of
the officers, and the provision requiring both men and
women to be appointed on the Board merely recognizes the
inherent differences between men and women immutably
fixd by nature and also recognizes political equalities im-
posed by law upon men and women, and qualifies both men
and women electors for appointment under the Act. This
is permissable even though the number of each sex to be
appointed is prescribed, since all the electors of the county
are the body from which the Governor appoints, and desig-
nating the number of each sex that may be appointed is
merely incidental to the express qualification of all electors
for appointment. The peculiar nature of the special
duties make it appropriate that members of both sexes

be appointed. The Governor's appointing power is not unduly circumscribed.

It is usual to prescribe the qualifications of persons who may be appointed officers to become members of administrative Boards, such qualifications having reference to attainments that peculiarly fit the persons for performing the particular duties imposed by law. See Medical Board, Sec. 2174, Rev. Gen. Stats. 1920; Dental Board, Sec. 2020, Rev. Gen. Stats. 1920; Osteopathic Board, Sec. 2185, Rev. Gen. Stats. 1920; Optometry Board, Sec. 2193, Rev. Gen. Stats. 1920; Board of Nurses, Sec. 2202, Rev. Gen. Stats. 1920; Board of Pharmacists, Sec. 2211, Rev. Gen. Stats. 1920; Board of Architects, Sec. 2229, Rev. Gen. Stats. 1920; Embalmers Board, Sec. 2258, Rev. Gen. Stats. 1920; Engineer's Board, Sec. 2275, Revised General Statutes, 1920. All such Boards are composed of statutory officers who are appointed by the Governor. See also Chapter 9201 and 9330, Acts of 1923; Shurtleff v. United States, 189 U. S. 311, 23 Sup. Ct. Rep. 535. The statute requires the Board of Engineers to be composed of three civil engineers, one mining or electrical engineer and one mechanical engineer or naval architect. The Medical Board under Chapter 8415, Acts of 1921, consists of five allopath physicians, three electric physicians and two homeopathic physicians.

It has been held that as to statutory officers, the Legislature in defining the qualifications of such officers may reasonably prescribe the place and length of residence in the State of persons who are eligible to be appointed to such offices by the Governor. State ex rel. Moodie v. Bryan, 50 Fla. 293, 39 South. Rep. 929; that the Legislature may prescribe the qualifications of statutory officers, In re Campbell's Registration, 197 Pa. St. 581, 47 Atl. Rep. 860, and that the Legislature may provide that a part

of a Board must be taken from a political party opposed
to that of the Governor. State *ex rel.* Harvey v. Wright,
251 Mo. 325, 158 S. W. Rep. 823, Ann. Cas. 1915-A 588.
See 22 R. C. L. 407.

The Governor's appointing power is not unduly limited
by the requirement that five men and four women shall
be appointed on the County Welfare Boards.

The Constitution in Sections 20 and 21, Article 3, pro-
vides that "the Legislature shall not pass special or local
laws regulating the jurisdiction and duties of any class
of officers, except municipal officers for assessment and
collection of taxes for State and County purposes," and
that such "laws shall be general and of uniform operation
throughout the State."

In providing that "the Legislature shall not pass special
or local laws" in any of the "enumerated cases," and
that in all such cases all laws "shall be general and of uni-
form operation throughout the State" the Constitution
distinguishes between "special or local laws," and laws
that "shall be general and of uniform operation through-
out the State" without defining either class of laws; but
generality and uniformity of operation do not forbid rea-
sonable classifications; and the legality of a legislative
classification depends upon its reasonableness with refer-
ence to the nature of the subject upon which the law is to
operate. State *ex rel.* Buford v. Shepard, 84 Fla. 206, 93
South. Rep. 667.

Chapter 9274 is not a "special or local law," for the
reason that it is a law based upon a proper classification
that is potentially applicable throughout the State, in that
any county may acquire a population of over 100,000,
though only one county may now be in that class. The
provision "according to the last Federal census" is pro-
gressive and has reference to each Federal census as it

occurs. Ex Parte Wells, 21 Fla. 480; State *ex rel.* Lamar v. Jacksonville Terminal Co., 41 Fla. 363, 27 South. Rep. 221; Collier v. Cassady, 63 Fla. 390, 57 South. Rep. 617; Givens v. Hillsborough County, 46 Fla. 502, 35 South. Rep. 88; Whitaker v. Parsons, 80 Fla. 352, 86 South. Rep. 247; Carlton v. Johnson, 61 Fla. 15, 55 South. Rep. 975; Fine v. Moran, 74 Fla. 417, 77 South. Rep. 533; Bloxam v. Florida Cent. & P. R. Co., 35 Fla. 625, 17 South. Rep. 902; Harwood v. Wentworth, 162 U. S. 547, 16 Sup. Ct. Rep. 890; Ex Parte Loving, 178 Mo. 194, 77 S. W. Rep. 508; State *ex rel.* v. Condon, 108 Tenn. 82, 65 S. W. Rep. 871; Cook v. State, 90 Tenn. 407, 16 S. W. Rep. 471; Archibald v. Clark, 112 Tenn. 532, 82 S. W. Rep. 397; City of Indianapolis v. Navin, 151 Ind. 139, 47 N. E. Rep. 525, 51 N. E. Rep. 80; 25 R. C. L. 818; 227 U. S. 51; Ann. Cases 1915 B. 968; 124 Tenn. 235.

Uniformity of operation throughout the State does not require universality of operation throughout the State. The former relates to similarity of conditions affecting subjects or localities of the State that are appropriately classified. The latter relates to the whole and every part of the State.

A statute relating to subdivisions of the State or to subjects or to persons or things as a class based upon proper distinction and differences that inhere in or peculiar or appropriate to the class, is a general law; while a statute relating to particular subdivisions or portions of the State or to particular places of classified localities, is a local law; and a statute relating to particular persons or things or other particular subjects of a class, is a special law. See 17 Fla. 238.

Classifications of counties for governmental purposes based upon population is permissable in enacting general laws. Clark v. Finley, 93 Tex. 171, 54 S. W. Rep. 343;

Farnum v. Warner, 104 Cal. 677, 38 Pac. Rep. 421; Thomas v. State, 136 Tenn. 47, 188 S. W. Rep. 617; State v. Ames, 91 Minn. 365, 98 N. W. Rep. 190; Hall v. State, 124 Tenn. 235, 137 S. W. Rep. 500; Russell v. Esmeralda County, 32 Nev. 304, 107 Pac. Rep. 890; Murphy v. State, 114 Tenn. 531, 86 S. W. Rep. 711; Cooper v. Rollins, 152 Ga. 588, 110 S. E. Rep. 726, 20 A. L. R. 1105; Commonwealth v. Blackley, 198 Pa. 372, 47 Atl. Rep. 1104.

The decision in Murray v. Board of Com'rs of Ramsey County, 81 Minn. 359, 84 N. W. Rep. 103, on the facts under the controlling organic law is not in conflict with the above citations.

Even if the statute may be regarded as a local or special law, such laws are by the constitution expressly authorized for purposes of county government (Sec. 24, Art. 3). and the act is not for the "assessment and collection of taxes," or "regulating the jurisdiction and duties of any class of officers" within the meaning of Section 20, Art. 3 of the Constitution, but it is for the establishment of a public instrumentality to serve a county purpose, not in conflict with, but consonant with the command of Section 3, Article 13 of the Constitution that "The *respective* counties of the State shall provide *in the manner prescribed by law* for those of the inhabitants that by reason of age, infirmity or misfortune, may have claims upon the aid and sympathy of society."

The provisions relating to the duties of county officers are mere incidents to the main purpose of the law, which is not an Act to regulate the assessment and collection of taxes or to regulate the jurisdiction and duties of any class of officers, but provides for the establishment and maintenance of a public institution for county purposes; therefore the provisions of the Act as to the assessment and collection of taxes for the purposes of the Act, and as

to duties of officers being merely incidental to the main purposes of the Act, do not violate Section 20 of Article 3, particularly in view of Section 24, Article 3; Section 5, Article 9, and Section 3 of Article 13. Kroegel v. Whyte, 62 Fla. 527, 56 South. Rep. 498; State *ex rel.* Cheyney v. Sammons, 62 Fla. 303, 57 South. Rep. 196; Lainhart v. Catts, 73 Fla. 735, 75 South. Rep. 47; Bannerman v. Catts, 80 Fla. 170, 85 South. Rep. 336; Berry v. Hardee, 83 Fla. 531, 91 South. Rep. 685.

The county commissioners are provided for by the constitution which declares that "the powers, duties and compensation of such county commissioners shall be prescribed by law." The constitution is not violated by a provision that the county commissioners shall levy a tax in an amount fixed by other county officers when the statute itself authorizes other county officers to fix the amount within a stated limit. Jones v. Board of Public Instruction, 17 Fla. 411; Hunter v. Owens, 80 Fla. 812, 86 South. Rep. 839. The authority and duties prescribed by Chapter 9274 may be by law conferred upon other officers than the county commissioners. See State *ex rel.* Luning v. Johnson, 71 Fla. 363, 72 South. Rep. 477; Board of Comm'rs of Escambia County v. Board of Pilot Comm'rs of Port of Pensacola, 52 Fla. 197, 42 South. Rep. 697. The statute merely adds to the duties of the county commissioners in assessing taxes for county purposes.

The Act relates to a county purpose and is well within the legislative discretion to enact. If the provision as to extending the privileges and use of the county institution and its facilities to non-residents is invalid it may be regarded as eliminated.

The transfer of public property from other county agencies to the new instrumentality for appropriate public county purposes, is within the power of the Legislature

and is matter properly connected with the subject expressed in the title of the Act; and the repeal of the statutes under which the former agencies existed is appropriately a part of the Act under its title, since such repeal is matter properly connected with the establishment of a new agency for similar county purposes, and it is not material whether such repeal be sufficiently referred to in the title of the Act or not.

The powers and duties of the State Board of Health are not affected by the Act. County property is subject to its control under the law even though the title be in particular boards, officers, persons or corporations.

The County Welfare Boards provided for by Chapter 9274, Acts of 1923, are not "educational, agricultural, mechanical, mining, transportation, mercantile or other" companies or associations having an independent existence for private purposes, but each is merely a subordinate agency established in aid of a public purpose, therefore the provision of the Act that each of the County Welfare Boards "shall be a corporation," &c., does not violate Section 25 of Article III of the Constitution. State *ex rel.* Moodie v. Bryan, 50 Fla. 293, 39 South. Rep. 929. See Chapter 9201, Acts of 1923, and Section 2439, Revised General Statutes, 1920.

In view of the above quoted provisions of the Constitution relative to county government, to county taxation and to the duty of the counties of the State respectively to provide "in the manner prescribed by law" for those of its inhabitants that by reason of age, infirmity or misfortune, have claims for public aid, Chapter 9274, Acts of 1923, cannot fairly be said to violate organic law so as to render the statute inoperative and void.

Affirmed.

TAYLOR, C. J. AND TERRELL, J., concur.

WEST, J., concurs in conclusion.

ELLIS AND BROWNE, J. J., dissent.

ELLIS, J.—Dissenting.

Under a title which for descriptive words was extraordinarily barren in that it contained only one and that one of such general meaning that it may be said to embrace any phase of human life, physical, intellectual, moral or spiritual that may be considered to be a state of well being with reference especially, as Webster's International Dictionary of the English Language states, to "condition of health, happiness, prosperity or the like" or "exemption from evil or calamity," the Legislature, by Chapter 9274 of the Session of 1923 attempted to, and, according to the majority opinion, did create an administrative agency for such counties in this State as have a population of over one hundred thousand according to the last Federal census, with powers which partake of the character of judicial, legislative and executive functions. Under this classification the Act applies only to the County of Duval.

The purpose of the Act was to create a "welfare" agency. It was named in the title "County Welfare Board." The word "County" merely restricts the territorial activities of the "Board" while the latter word is merely descriptive of the "outward evidence of the inward grace;" so the subject of the Act, as expressed in the title, was the "Welfare" of the County. It possessed the merit of brevity as required by the Constitution, Sec. 16, Article III, but shattered both the letter and spirit in

so far as they require singleness of subject for legislative acts.

The Act classifies the eligible office holding population of the County into two classes: male and female. The basis of this classification, as all good men will probably concede, is spiritual. If the two sexes possess in equal degree all office holding qualifications there is obviously no need for the classification. Therefore, in the legislative view one sex must necessarily possess a qualification for "Welfare" work which the other either does not possess, or possesses in smaller degree.

In so far as qualification for office involves physical endurance, mental ability and moral integrity the equality of the sexes is possibly conceded by the people's legislative and judicial employees. So that in the field of governmental activities there is no basis for the classification of our agents in so far as physical, moral or mental qualifications are concerned. If any other qualification is required it must be found in that part of man's nature where soul dominates the life and shapes the character, enabling one with greater accuracy and clearer vision to perceive the line between good and evil which so often is obscured by selfish interests, partisan considerations or racial prejudices.

As if in challenge of the poet's assertion that the "Female of the species is more deadly than the male" the Legislature, composed exclusively of the male sex, provided that the "Board's" membership should consist partly of men and partly of women; but that this "progressive" recognition of women, as a governmental factor, might not be too far reaching and her spiritual influence too ethereal for common welfare they put her, as a class, in a hopeless minority as if the 'word of promise might be held to the ear' and when occasion required, if ever it

should, might be "broken to the hope." But it is not with the wisdom of an act nor the accuracy of legislative findings of fact as a basis for a rule of conduct that the Court has to deal, but with limitations imposed by the natural rights of man and the letter and spirit of the Constitution upon legislative activities.

In view of the Nineteenth Amendment to the Federal Constitution there exists no principle in government upon which women, as a class, may be excluded from service as governmental officers. To limit, therefore, her membership upon any board, commission, court or legislature to a minority is to assert the power of reducing her opportunity for service to a negligible quantity. Eligibility to office does not rest upon considerations of sex nor does woman's qualifications for public service rest upon assumed spiritual endowments, or beauty of soul, nor peculiar faculty for discerning the distinctions, with clearer perceptions between right and wrong than her male compatriot. As a qualified member of the electorate she is, so far as constitutional, logical, legal, physical, moral and intellectual inhibitions are concerned, free and qualified to become an official of the government in any of its branches; and being so qualified her activities cannot be limited to that sphere of influence to which she may be assigned by her generous but mistaken fellow citizens of the male persuasion. The governmental agency called "County Welfare Board" being created the Constitution intervenes and requires the membership to be selected either by the people at an election or by the Governor by appointment. Sec. 26, Art. III, Constitution.

Qualifications, in addition to those of citizenship and age, may be prescribed by the Legislature for holding public office but there must be some relation between the qualifications prescribed and the duties to be performed.

It is difficult to understand by what process of reasoning, or principle of political science, it may be said that a woman is qualified to hold office as a member of a commission only when the female members thereof number three, or less, but when the board or commission has among its membership four women no other woman is qualified for membership, although there may be five vacancies upon the board to fill. The theory under which a man qualified in every respect to hold office is said to be qualified only when there are four or less members of his sex on the board, and not qualified if there are more, is equally incomprehensible.

The able counsel for 'the plaintiff in error in his brief says: ''What the act attempts is nothing more nor less than a legislative prescription of sex as a qualification for holding a State office.'' I quite agree with that view. As he states: ''viewed from any angle .it gets back to that''.

In the elaborate opinion of Mr. Justice Whitfield, who expressed the view of the majority in this case, the statement is made, after some reference to the power of the Legislature to prescribe qualifications of officers, that ''the provision requiring both men and women to be appointed on the Board merely recognizes the inherent differences between men and women immutably fixed by nature and also recognizes political equalities imposed by law upon men and women, and qualifies both men and women electors for appointment under the Act''. Continuing he says: ''This is permissable even though the number of each sex to be apointed is prescribed, *since* all the *electors* of the county are the body from which the Governor appoints, and designating the number of each sex that may be appointed is merely incidental to the *express* qualification of *all* electors for apointment.''

There is no text book or decision quoted or cited in support of the assertion that sex may constitute the basis of a classification of persons, who possess the qualifications for office, for the purpose of limiting the number of either class that may participate in the discharge of governmental duties and the exercise of sovereign power. Just what are the "inherent differences between men and women immutably fixed by nature", when considered in reference to capacity for, of efficiency in, the discharge of the duties of a public office, we are not advised. Yet, a constitutional executive power is taken away and the act justified by an assertion supported by no precedent, principle nor theory in governmental science, nor judicial utterance.

Aside from mere sex differences, what are the "inherent differences between men and women immutably fixed by nature" which in the interests of government and public welfare should be considered to the end that there must be a predominance of one sex over the other in certain activities of government which may be classed under the head of human or community "welfare"? If woman possesses any quality of spirit or mind not possessed by the male (I do not use the overworked and meaningless phrase "heart or brain" for reasons that are well understood) that peculiarly fits her for membership on "welfare" boards over her male fellow citizens it would seem to be inconsistant to restrict her influence and atrophy her good qualities by limiting her opportunities for a full and complete exercise of them.

Nor do I understand what is meant by the words: the Act "recognizes political equalities imposed by law upon men and women, and qualifies both men and women electors for appointment." The political equality of men and women was recognized and imposed by the Nineteenth

Amendment.   It did not require an Act of the Legislature to render that recognition efficient or to establish her political status as one qualified to hold office.

The Act clearly attempts by this classification of persons by sex to "limit the exercise of the Governor's executive judgment and discretion in selecting for appointment from among persons who are qualified for appointment under the provisions of the act itself." . This is true because all qualified electors in the county in which the board is created are eligible to appointment under the Act, but the Act restricts the power by requiring the appointment of part of the membership of the board from certain classes of persons. ˙ Westlake v. Merritt, 85 Fla. 28, 95 South. Rep. 662.

Since the Nineteenth Amendment sovereignty, in so far as that word signifies supreme political power as evidenced by the might of the ballot; the power that determines and administers the government of a State in the final analysis, is vested in woman as completely as in the other sex. Politically sex makes no difference and cannot be the basis of classification in determining eligibility to office.   To discriminate between the sexes as the Legislature attempted by this Act to do renders it as objectionable to the principles of free government as ordained by our constitutions and established, we hope, for all time in this Country, as any attempted discrimination between races.

I concur in the views expressed by Mr. Justice Browne, in his dissenting opinion, upon both propositions that the Act violated the provisions of Sections 16 and 27 of Article III of the Constitution.

I am also of the opinion that the Act violates the provisions of Section 20, Article III, of the Constitution inhibiting the passage of local laws regulating the jurisdiction and duties of any class of officers, except municipal

officers, and for the collection of taxes for county pur-
poses. According to the classification of counties by popu-
lation, as in the Act under consideration, Duval County
was at the time of the passage of the Act the only county
in the State with a population of over one hundred thou-
sand according to the "last Federal census." The last
Federal census was taken in the year 1920 and the result
was known in 1923. To limit the application of the pro-
visions of the Act to "each County in Florida having a
population of over one hundred thousand according to the
*last* Federal census" was as definite a description of the
County of Duval as if the County had been designated by
name or territorial boundaries. If the Act had provided
that its provisions should apply to every county when-
ever, by a Federal census, it should appear to have a popu-
lation of over one hundred thousand the purpose of limit-
ing its provisions to the County of Duval would have been
a little more effectively screened. The census of 1920 was
as definitely designated by the term "last Federal census"
as if the language of the Act had designated it by the year
in which the census was taken.

By the Act in question the duties and jurisdiction of
the class of officers to be known as "members of the
County Welfare Board" were regulated. The jurisdic-
tion and duties also of the Board of County Commission-
ers of Duval County were affected by the provisions of the
Act. Because within the scope of "Welfare" activities,
as outlined by the Act, the duties and jurisdiction of the
Board of County Commissioners were practically trans-
ferred to the "Welfare Board," in so far at least as such
duties relate to the care of certain corporate property; to
building and keeping in repair some of the county build-
ings; the representation of the county in the prosecution
and defense of some legal cases; to the care and providing

for the poor and indigent; to the apportionment and ordering of the levy of certain county taxes and to the approving of certain accounts against the county. So the Act was special and local and dealt with at least two of the subjects forbidden by Section 20 of Art. III to be dealt with by local or special legislation.

But the majority opinion asserts that the Act is not "special or local law" because it is based upon a "proper classification that is potentially applicable throughout the State, in that any county may acquire a population of over 100,000, though only one county may now be in that class."

But that reason rests upon an assumption that is not justified by either the language of the Act or any meaning of its language that the laws or rules of statutory construction would permit, and upon the further assumption that classification on the basis of population is a valid classification upon which to base a statute dealing with the subjects covered by the Act. The Act went into effect July 1, 1923. The first sentence of the first section is as follows: "There *is* hereby created a County Welfare Board *in* each County of Florida *having* a population of over one hundred thousand according to the *last* Federal census." There is no ambiguity in this language. Its meaning can only be regarded as doubtful by one who thinks that its language should have been different. The use of the word *"last"* in describing the Federal census, according to which the counties in Florida are to be tested or classed by population, renders the Act impossible of application to *any* county in Florida except Duval County. To say that the classification is "potentially applicable throughout the State" it is necessary to eliminate the word *"last"* as descriptive of the census by which the counties are to be designated as counties in which a "Wel-

fare Board'' *may be* created, and interpolate others to make the sentence thus altered conform to the rules of grammatical construction or syntax.

It is unusual in construing a statute to eliminate words used or interpolate others not used by the law-making body. It is equally unusual to resort to interpretation or construction when the language is plain and unambiguous, but it is beyond all precedent to eliminate words used by the Legislature and interpolate others in interpreting a statute, the words of which are plain and of definite and precise meaning, even when used in their common ordinary and generally understood sense.

''In interpreting the words of a statute the courts perform no function of legislation, but seek only to ascertain the legislative intention and where the language is plain, definite in meaning without ambiguity, it needs no interpretation or construction and itself fixes the legislative intention.'' Fine v. Moran, 74 Fla. 417, 77 South. Rep. 533.

The above case cited in the majority opinion with others does not support the text to which it is cited in that opinion, but on the contrary contains the language which is quoted above, which rule has obtained in this State since its early history.

As stated in that case it is not within judicial power to ''correct supposed errors, omissions or defects in legislation'' and the practice of doing it is most dangerous to our institutions and form of government.

A statute is not to be read as if open to construction as a matter of course. It is only in the case of ambiguous statutes of uncertain meaning that the rules of construction have any application. Where the language of a statute is plain and unambiguous and its meaning clear and unmistakable there is no room for construction and

the courts are *not permitted* to search for its meaning beyond the statute itself. See Caminetti v. United States, 242 U. S. 470, 37 Sup. Ct. Rep. 192, Ann. Cas. 1917-B 1168, L. R. A. 1917-F 502; 25 R. C. L. 957; 36 Cyc. 1102 and numerous authorities cited.

This rule is elementary. It seems idle to cite authorities in support of it. When such elementary principles of the law are not observed, principles which, like the one involved here and referred to immediately above, are of peculiar value to the maintenance of the American theory of the division of the powers of government, one begins to consider how insecure are our privileges, even liberties, as American citizens. Both the letter and spirit of the Constitution are opposed to the purpose of the Act, which seems to be the management of a great part of the internal affairs of a county by a commission appointed at Tallahassee, the Capital, Suburban Inv. Co. v. Hyde, 61 Fla. 809, text 812, 55 South. Rep. 76, and this purpose is sought to be accomplished by classification of counties by a property or characteristic in no wise related to the subjects dealt with by the Act, which grouped under the title, provision for inhabitants who by reason of age, infirmity or misfortune have claims on the aid and sympathy of society, are many, and its machinery for carrying out such purpose to consist of a Board composed of members who are classified according to sex, one class of which to be forever held in minority because of the "inherent differences" existing between her sex and the sex of the majority of such Board.

Is such legislative purpose to be upheld by judicial remodeling of the Act by the elimination of words and the interpolation of others, which latter is essential to preserve even a semblance of the rules of grammar when the objectionable word is removed?

In 1923 *the "last"* Federal census was the census of 1920; and, that census is not applicable, and cannot be made applicable under the Act, to any county in the State but the County of Duval. Hence the words *"the last"* must be eliminated and when eliminated the sentence would be very ambiguous because there would be doubt as to whether a particular census of the past was in the legislative mind or whether it had in mind any census that might thereafter be taken. So it becomes necessary to interpolate other words to perfect the sentence thus mutilated. But such performance never was, and is not now, the function of courts where the words as used by the Legislature are clear in meaning according to their usual and generally understood use.

It is said that the subject is the establishment and maintenance of county hospitals for the care of the county indigent who are sick or may become ill. But that limits the meaning of the word "Welfare" to only one of its many significations, each one of which, in our complex social relations and conditions, constitutes a subject within itself.

Under the Act the County "Welfare Board" shall: "Provide for those of the inhabitants of its county who by reason of age, infirmity, or misfortune have claims upon the aid and sympathy of society." These are the words of the Constitution. See Sec. 3, Art. XIII, which requires this duty to be performed by counties. That is to say, through county organizations and at county expense. "The provisions of the organic law contemplate the existence of a Board of County Commissioners who are general administrative officers of the county." See Suburban Inv. Co. v. Hyde, *supra.* Yet, here is a duty involving varied activities, many of which unrelated, from the education of indigent children to the burial of indigent

persons, whether old or young. To prepare them, the indigent, who, when born or because of age, infirmity or misfortune, have claims upon the aid and sympathy of society, for adjustment to the demand of that society with its intricate and complex relations between individuals. To meet this requirement Foundling Asylums; homes for the children of indigent parents where food and clothing are supplied; homes for indigent adults; schools for such children; hospitals and cemeteries for all and all the accessories to these, including supply depots for food, clothing and drugs, must be provided, operated and maintained.

This great demand upon the counties, this moving appeal to humanity, the urgent call for the sympathy and aid of society, occurs only when a county has a population of one hundred thousand, according to the legislative idea as expressed in the Act under consideration. So population is made the basis of classification of counties in relation to the humanitarian activities required of all counties by the Constitution.

It is probably impossible to lay down any rules, except rules most general in character, for determining a proper basis of classification for legislative purposes. The Legislature cannot adopt an arbitrary classification. The classification must rest on some difference which bears a natural, reasonable and just relation to the act in respect to which the classification is proposed. It must be based on substantial distinctions which make real differences and are germane to the purposes of the law. "Classifications adopted for legislative regulation should have some relation to, or reasonable basis in, essential differences of conditions and circumstances with references to the subject regulated, and should not be merely arbitrary." See Seaboard Air Line Ry. v. Simon, 56 Fla. 545, 47 South. Rep.

1001; 6 R. C. L. 381-383; Jacksonville, T. & K. W. Ry. Co. v. Prior, 34 Fla. 271, 15 South. Rep. 760; 36 Cyc. 992.

While in the exercise of its power to make classifications for the purpose of enacting laws the Legislature has a wide range of discretion, the question becomes a judicial one when there is no reason for the law that would not require with equal force its extension to those persons whom it leaves untouched. See Barrett v. State of Indiana, 229 U. S. 26, 57 L. Ed. 1050, 33 Sup. Ct. Rep. 692.

Classification on the basis of population for the purpose of legislation, upon the subject of special provisions for the inhabitants of a county, who by reason of age, infirmity or misfortune may have claims upon the aid and sympathy of society (Sec. 3, Art. XIII, Constitution) is obnoxious to the objection that it is special legislation as to the affairs of counties. See Murray v. Board of County Commissioners 81 Minn. 359, 84 N. W. Rep. 103, 83 Am. St. Rep. 379.

The Act violates the provisions of Sec. 3, Art. XIII, also Sec. 1 of the same Article which requires institutions with many of the powers to be exercised by the "Welfare Board" to be "fostered and suported by the State." A "general hospital, clinic and out-patient department" "for the medical and surgical diagnosis and treatment of human diseases of all kinds" and the extension of the facilities of such hospitals to persons who are not indigent and to non-residents and requiring the "Board" to make annual reports to the Governor of "its family welfare, work and its hospital work, including the number of patients, various sums received from taxes and other sources, and how and for what purpose such monies have been expended" is a state institution of the kind contemplated by Section 1 of Article XIII.

There are other objections to the Act in view of Con-

stitutional limitations upon legislative power that are apparent from a casual reading of the provisions of the statute, but it is unnecessary to discuss them.

I think that the orders sustaining the demurrer to the information and granting the motion to quash it were erroneous and should be reversed.

BROWNE, J., Dissenting.

I dissent on four grounds:

1. I think the Act is in contravention of Section 16, Article 3 of the Constitution of Florida, in that the subject of the bill is not "briefly expressed in the title", and is not even *indicated,* so as to give the public, the slightest intimation of the character and purpose of the legislation.

The subject of the bill, expressed in the title, is the creation of "A County Welfare Board". Under that title any of the myriad subjects embraced in the term "welfare" could be regulated by a board, and none of them expressed or indicated by the title.

It happens in this instance that the Board, created by this Act, is to provide for the infirm, the unfortunate, and the indigent; to erect hospitals and poor houses, establish clinics, etc., etc., but none of these subjects is expressed in the title, nor does it give the slightest intimation of the character of welfare work to be done by the Welfare Board.

Under the title of this Act, The Welfare Board created by it, might have the duties prescribed by the Act, or it might have entirely different duties, such as the control and management of minors; the use of public roads; it could regulate public morality; could provide for tick eradication; the drainage of swamps; sanitary inspection; rent rates; resale of theatre tickets, *et idem as infinitum;*

since these and many other unrelated subjects have been held to be proper matters for legislative regulation for the public welfare.

"Welfare" is a comprehensive and all-embracing term, and every law that purports to be in the interest of public health, public safety, morals and happiness, (which seem to embrace every human activity) has been sustained as being for the "public welfare" that greatly over-worked term, and sapper and miner of the Bill of Rights.

If a title "To Create a Welfare Board" meets the constitutional requirement, because, as is held by the majority of the court, the title "fairly gives notice of the subject of the Act so as to reasonably lead to an inquiry into the body thereof," it follows, that an Act with a title, "To Create a Board," would meet the constitutional requirement, since it too would fairly give "notice of the subject of the Act so as to reasonably lead to an inquiry into the body thereof." By the same reasoning, if the title merely expressed that it was "An Act" it would be sufficient under the doctrine of this case, that any title is sufficient, when the subject of the legislation can be ascertained by "an inquiry into the body thereof."

Where the title of an act is such that it may relate to any one of the innumerable subjects that may be regulated for the public welfare, I think it wholly fails to comply with the constitutional requirement that the "subject of the legislation shall be briefly expressed in the title." Such an innocuous title would conceal, rather than express, the subject of the proposed legislation.

(2) I think the Act is in contravention to Section 27, Article 3 of the Constitution, in that it attempts to limit the constitutional power of the Governor, in the appointment of officers.

This court has recently disapproved of a statute that

sought to place a limitation on the Governor's constitutional power of appointment. Westlake v. Merritt, (decided June Term, 1923), 85 Fla. 28, 95 South. Rep. 662.

It is true the limitation in that statute was of a different kind, from that of the statute under consideration, but each is a limitation upon the Governor's constitutional power, and the principle that condemned the one, condemns the other.

If it be contended that the legislature may require certain *qualifications* for office holders, and that the requirement of this Act, that the Governor "shall appoint five men and four women", on the Welfare Board, is a "qualification," the answer seems patent, that neither sex, nor color is a "qualification," in the matter of office holding.

The fact that the Governor makes no complaint is not determinative of the question of the limitation of his power.

If the legislature could limit the number of women to be appointed to four, it could limit it to one, or require the Governor to appoint a board composed entirely of men or women.

If the legislature can make sex or color, qualifications, it could require the Governor to appoint persons of different races to office.

The argument advanced by the respondents that some of the duties of the Welfare Board could be performed better by women than by men, if accepted, is potent to support and justify the appointment of persons of different races where there are people of such races to be cared for, one of which would furnish a large number of the infirm, the unfortunate and the indigent.

Had the Act under consideration provided for the ap-

pointment of four women of one race and five men of another, no prophet is needed to fortell what would be its fate.

The proposition I urge, is made clearer by bearing in mind, that the power of the Governor to appoint officers, rests upon the same authority as that of the people to elect. Had the bill provided that the electors of Duval County should elect a board to consist of five men and four women, it is palpable that it would have no effect, since the nine receiving a plurality of the votes, would be elected, whether all were men or all were women. Sec. 8 Art. 16, Constitution of Florida.

I find nothing in the Constitution that distinguishes between the power of the Governor to appoint and that of the people to elect, so as to warrant the legislature in restricting the power of one that does not apply to the other.

(3) The Act provides that each member of the Board shall give a bond in the sum of $5,000.00. That provision bars a woman under coverture, not a free dealer, from serving on the Board, as she cannot execute a bond. Equitable Building & Loan Ass'n. v. King, 48 Fla. 252, 37 South. Rep. 181.

I regard such a provision, as an unjust and unwarranted discrimination against women under coverture.

(4) The Act requires that the bond to be furnished by the members of the Welfare Board, shall be ''with a surety company qualified to do business in the State of Florida as surety.''

This is repugnant to Section 13, Article 16 of the Constitution of Florida, which authorizes State, county and municipal officers, to give bonds with personal sureties, or with a guarantee or surety company'' as surety. This

option given to officials by the Constitution cannot be taken from them by legislative enactment.

It is objectionable also as an attempt to create a monopoly in favor of bonding companies, and places an unwarranted financial burden upon officers, by requiring them to pay a fee for services that may be performed for them without charge by persons duly qualified to act as sureties.