JACKSON LUMBER Co. ET AL., *Appellants*, v. WALTON COUNTY, *Appellee*.

En Banc.

Opinion Filed March 29, 1928.

Petition for Rehearing Denied April 17, 1928.

636

638

W. W. *Flournoy*, Counsel for Appellants.

*D. Stuart Gillis, Watson, & Pasco & Brown*, Counsel for Appellee.

BROWN, J.—This is an appeal from a final decree of the Circuit Court of Walton County validating an issue of bonds of Walton County in the sum of $1,250,000, in which proceeding the parties appellant were intervenors. The bonds were authorized by an Act of the last Legislature, approved June 3, 1927, a copy of which is attached to the original petition, entitled:

"An Act authorizing the Board of County Commissioners of Walton County, Florida, to issue and sell coupon bonds in the sum of one million, two hundred and fifty thousand ($1,250,000.00) dollars, for the purpose of constructing, improving, repairing and rebuilding certain roads and bridges in Walton County, Florida, and to provide for the levy and collection of taxes on property to provide a sinking fund to redeem the bonds at said maturity and to pay the interest thereon."

By Section 1 of the Act authority was given the Board of County Commissioners of Walton County to issue the bonds "in such form, bearing such rate of interest not to exceed six per cent per annum, payable semi-annually, and becoming due at such time or times not to exceed thirty years from the date of their issue, and upon such conditions as may be determined by resolution of the said Board of County Commissioners adopted and recorded in their minutes."

The same section provides that the proceeds of the sale should be used for the purpose of constructing, rebuilding, improving and repairing certain roads and bridges specifically designated in the Act, the larger part of such proceeds being allocated to the construction of State Roads Nos. 33, 40, 60, 10 and 110, and the remainder to certain county roads, so much of them as were parts of State roads to be constructed on specifications of the State Road Department and under the supervision of said Department, upon the agreement of the Department to accept the roads when completed according to the specifications for maintenance, the Road Department being authorized to make such agreement. The roads which were not parts of the State roads extending through the county were to be constructed under the supervision of a competent engineer employed by the county and to be paid for out of the moneys not required to be expended on the part of State roads.

Section 2 of the Act provided for the disposition of any surplus of the funds allocated to the parts of State roads.

By Section 3 of the Act the County Commissioners were "authorized to incur such reasonable expense in the preparation and sale of the said bonds and the administration of the funds provided for * * * as may be necessary and pay same out of the proceeds of the said bonds, and

also pay the first twelve months' interest on said bonds out of such proceeds.''

Section 4 of the Act required the levy of all such taxes as may be necessary to provide interest and sinking fund for the retirement of the bonds, the levy of the taxes, in the discretion of the County Commissioners, to begin in 1928.

By Section 5 of the Act the County Commissioners were to perform the duties which otherwise would have devolved on bond trustees.

Section 6 of the Act requires the bonds to be sold in the manner provided by law.

The County Commissioners determined to issue the bonds and adopted appropriate resolutions to that end in June, 1927, by which it was provided that the bonds were to ''bear interest at the rate of either 5½ or 6 per cent per annum.''

Thereupon a petition was filed for the validation of the bonds. A question was raised whether the designation of the rate in the alternative was sufficient and the County Commissioners, *pendente lite* on September 9, 1927, amended their resolutions so as to make the bonds bear interest at 5½ per annum.

The petitioner then filed a supplemental petition, which the appellant, Louisville & Nashville Railroad Company, moved to strike, but to which the other appellants interposed no objection. The appellant, Louisville & Nashville Railroad Company, having dismissed its appeal, the record stands here without any objection to the supplemental petition. On this supplemental petition there was new notice to the State attorney and the intervenors and new publication to tax payers as on an initial proceeding.

The sufficiency of the petition and of the supplemental petition as a combined proceeding was challenged by the

demurrer and answer joined in by all the appellants. The court overruled the demurrer and sustained the motion to strike the various paragraphs of the answer, and entered a decree validating the bonds.

1. The provisions of Section 3298, Rev. Gen. Stats., as amended by Chapter 11854, Laws of 1927, empowers the Circuit Judge to make such orders as to the proceedings in said cause ''as will best conserve the interests of all parties and enable him to render his final decree with the least possible delay.'' The supplemental petition brought forward the original petition with the single change as to the specific rate of interest. A new order was made for notice to the State Attorney and new notice to the tax payers, just as on the filing of an original petition. The practical effect of the filing of the supplemental petition was to combine it and the original into one, so that with the new order and new notice it was in effect the same as the beginning of a new proceeding. The State Attorney and the intervenors answered and had a hearing as if the whole matter had been on one petition. While Sec. 3296, Rev. Gen. Stats., as amended makes no express provision for the filing of such a supplemental petition, we cannot see that any injury was done the intervenors by allowing it to be done in this case, under the conditions and according to the procedure adopted, which we think was within the power of the court to authorize under the above quoted provision of Section 3298 as amended.

2. As above shown, the Act authorized the issue and sale of the bonds at a rate of interest ''not to exceed six per cent per annum.'' The resolution as originally adopted provided that the bonds were to bear interest at ''either 5½ or 6 per cent per annum.'' It is contended that this rendered the entire original resolution illegal and void, and that the subsequent amendment thereto fixing

the rate at 5½ per cent could not cure the defect. In support of this contention, the case of Hillsborough County v. Henderson, 45 Fla. 356, is cited, and attention is also called to Section 3297, Rev. Gen. Stats., relating to validation proceedings, which requires the petition to show what rate of interest the bonds are to bear. In the Henderson case the resolution fixing the rate at ''not more than four per cent per annum'' was adopted by the Board of County Commissioners under the general statute which required the initial action to be taken by the board and then to be submitted by them to the electorate. One of the items of the program so to be presented to the electorate for their action was, under the statute, the rate of interest. This Court held that this general statute contemplated that this must be definitely fixed by the resolution and that the naming of the maximum rate was not sufficient. In the instant case, the authority to the board to issue the bonds comes directly from the legislature, and under the Act any rate of interest fixed by the board would have been valid provided it did not exceed six per cent. Even if the board should have determined a specific rate in the original resolution instead of an alternative rate (which did not however exceed the maximum prescribed in the Act), inasmuch as the proposition did not have to be submitted to the electorate, we see no good reason why the board could not subsequently amend their original resolution so as to make it prescribe a definite rate within the statutory limit, provided no rights of third parties created on the basis of their original resolution had arisen which would be prejudiced or impaired by their subsequent amendment. Under the last expression in the opinion in Getzen v. Sumter County, 89 Fla. 45, 57, 103 So. 104, the Circuit Judge could have validated the bonds, ''whether bearing interest at the rate of six per cent per annum or at a lower rate.''

In that connection, the Court said: "The proceedings provided for bonds bearing six per cent interest per annum, but if the bonds can be sold as contemplated by law at a lower rate of interest, there appears to be no legal objection to the lower rate." This is good common sense and fair interpretation, to my mind. The Circuit Court could, therefore, on the original petition have validated the bonds with a provision in the decree that the bonds as issued should bear a specific rate, to be determined by the county commissioners, not exceeding the maximum rate of six per cent per annum, named in both the statute and the original resolution. What possible injury could have been done the tax payers of the county, including the intervenors, by allowing the county commissioners to sell the bonds at a lower rate if they could, so long as the maximum fixed by law and by the resolution was not exceeded? Where the authority, as here, comes directly from the legislature, we see no valid reason why this could not have been done without coming in conflict with the rule laid down in the Henderson case, *supra*, which dealt with a different situation.

3. The question as to the sufficiency of the title of the Act, under Article 3, Section 16, of the Constitution, was not raised in the court below, but as it is insisted on in the briefs filed by intervenors in this Court, we have considered the point. The title shows that the object of the Act is to authorize a bond issue to raise funds for the construction, repair, etc., of "certain roads and bridges in Walton County" and to provide taxation to pay such bonds and interest thereon. The language used is broad enough to cover, and direct attention to, any roads and bridges situated in Walton County that might be designated in the body of the Act, whether county or State roads. It cannot be held that it was designed to mislead, because not spe-

cifically mentioning State roads, it having been decided that the construction or improvement of a State road situated within a county may be a county as well as a State purpose, for which bonds may be issued by the county, so far as that part of the State road in question, located within the county, is concerned. Lewis v. Leon County, 91 Fla. 118, 107 So. 146 and cases cited. It is well settled that, "If the title of an Act fairly gives notice of the subject of the Act so as to reasonably lead to an inquiry into the body thereof, it is all that is necessary.". State *ex rel.* v. Vestel, 81 Fla. 625, 88 So. 477; Jones v. State, 112 So. 556, 93 Fla. 603; Bannerman v. Catts, 80 Fla. 170, 85 So. 336; State v. Daniel, 87 Fla. 270, 99 So. 804; County Commissioners v. Jacksonville, 36 Fla. 196, 18 So. 339. We have also frequently held that the title need not attempt to index the contents of the Act. All matters in the body of this Act are fairly referable to and not inconsistent with the title. Needlessly long and detailed titles, attempting to index all the contents of acts, defeat their purpose. The "certain roads —in Walton County" mentioned in the title is clearly sufficient to lead to an inquiry as to what those roads are, and when the inquiry is pursued, the finding that included in these roads are parts of State highways within the county is not necessarily the finding of something other than a county purpose, or something which renders the Act unconstitutional on the ground that it contains two separate and distinct subjects. The title to the Act here in question appears to comply with the constitutional requirements.

4. Another contention is that the Act conflicts with Section 20, Article III of the Constitution, prohibiting local laws "regulating the jurisdiction and duties of any class of officers except municipal officers." The insistence on this point assumes that this is an Act "regulating the jurisdiction and duties" of the County Commissioners of Walton

County, and therefore void. This assumption is untenable. The object of the Act is not to regulate officials or a class of officials, but is to provide for the building of certain highways in Walton County, and the powers and duties vested in or impcsed upon the County Commissioners with reference to the issuance and sale of the bonds, the use and application of the proceeds and the levy of taxes to pay the principal and interest, are all incidental to the main purpose mentioned. It is well settled that legislation of this character is not in conflict with the constituticnal provision referred to. Our decisions to this effect are numerous. Among them are: Kroegel v. Whyte, 62 Fla. 527, 56 So. 498; State *ex rel.* v. Sammons, 62 Fla. 303, 57 So. 198; Lainhart v. Catts, 73 Fla. 735, 75 So. 47; Bannerman v. Catts, 80 Fla. 170, 85 So. 336; State *ex rel.* Buford v Daniel, 87 Fla. 270, 289; 99 So. 804, 810.

The dcctrine outlined in the preceding paragraph is supported by a consideration of Section 24 of Article III of the Constitution, which provides that, ''The Legislature shall establish a uniform county and municipal government, which shall be applicable except in cases where local or special laws are provided by the Legislature that may be inconsistent therewith.'' It was said in the case of Kroegel v. Whyte, *supra*:

''Section 24, of Article III, of the Constitution clearly permits the Legislature to pass special laws as to county government; this section indicates a disposition not to hamper the Legislature as to county affairs, in view of the widely divergent needs of the communities in a State differing so in soil, climate, population and otherwise; but there is another provision to which we did not give sufficient weight.''

''Section 5 of the Article IX on Taxation and Finance provides that 'the Legislature shall authorize the *several*

counties and incorporated cities and towns in the State to assesss and impose taxes for county and municipal purposes.' The use of the word 'several' drives us to the conclusion that the counties may be given power *severally* and hence they may be given it by special or local laws. We cannot construe the inhibition against special or local laws for the assesssment and collection of taxes for county purposes as an inhibition against an imposition of a tax for county purposes, in the face of the command to authorize the *several* counties to assess and impose taxes for county purposes. A general law authorizing all the counties to assess and levy a tax for a county purpose, of course, authorizes the several counties, each and every, to do so, but this power would have existed, had the word *'several'* been omitted. We cannot accuse the makers of our Constitution of using words idly, and we can give effect to this word only by declaring that it permits the Legislature to·grant by special or local law, authority to a county, or several counties, to assess and levy a special tax for a legitimate county purpose, provided only the manner and method of assessing and collecting the tax be regulated by the general law.' '' ''This legislation authorizes the County of St. Lucie to issue bonds for the building of a public dock, authority not conferred by general legislation upon other counties, and it is suggested that this may be offensive as regulating in a special or local law, the jurisdiction or duties of a class of officers not municipal. We shall not undertake to define the demarkation between regulations affecting the county government which is directly permitted, and regulations as to the jurisdiction and duties of any class of officers which are prohibited. In the matter now before us it may well be doubted if the conferring of a power upon a county through its County Commissioners to levy a tax to meet bonds issued for a county purpose, regulates their

jurisdiction and duties, seeing that the tax levy for all county purposes is provided for by them within fixed limits; but if by any stretch of language this be called a regulation, it is a mere incident to and the necessary concomitant with, the power we have held above to exist in the Legislature to authorize by special or local act, a county to levy a tax for a lawful county purpose.''

So the argument that the Constitution requires the ''jurisdiction and duties'' of county commissioners of all counties to be exactly the same in all respects is not sound. It is true that the differences thus far resulting from local legislation of this nature have been largely differences in detail—in degree rather than in kind. Lainhart v. Catts, *supra*. The legislation now under consideration adds no new class of duties to the functions of county commissioners and no new kind of jurisdiction. See also State v. Duval County, 76 Fla. 180, 79 So. 692; Whitaker v. Parsons, 80 Fla. 352, 86 So. 247; Ives v. Columbia County, 109 So. 235, 92 Fla. 30; State v. Smith 88 Fla. 151, 100 So. 509; McMullen v. Pinellas County, 106 So. 73, 90 Fla. 398.

5. Again, it is contended that this Act deprives the citizens and tax payers, and the county commissioners, of a discretion to which they are constitutionally entitled, constituting an invasion of local self-government either created, or impliedly recognized, by the Constitution. In answer to this, so far as the discretion of the county commissioners is concerned, it would appear to be sufficient merely to say that as to the issuance of the bonds the Act is not compulsory. The county commissioners are authorized, not commanded, to issue them for the purposes and in the manner set forth in the Act. It is true, if they decide to issue the bonds, they must pursue the provisions of the Act both as to the amount of the bonds, the alloca-

tion of the proceeds and the levy of the tax. Hampshire County v. Franklin County, 16 Mass. 76. However, if they in their discretion had decided that some of the roads named in the Act were not "expedient or for the best interests of the county," they could have withheld any action whatever under the Act, or otherwise; or, if they so desired, they could have declined to issue bonds under the special Act and proceeded under the general statute to submit to the electors a proposal for issuance of bonds for such roads as they did deem expedient or for the best interest of the county. Thus their discretion, if they had any which the legislature was bound to respect, was not taken away. But in State ex rel. v. Johnson, 71 Fla. 363, 72 So. 477, this Court, speaking through Chief Justice TAYLOR, said:

"We find nothing in our organic law that would prohibit the legislature from enacting a statute taking away from said county boards not only a part, but the whole of their powers of supervision and control of public roads and bridges, and lodging such powers elsewhere; since the control of all public highways is vested in the State absolutely without any constitutional limitations or restrictions."

This proposition was reasserted in State ex rel. v. Fearnside, 87 Fla. 349, 100 So. 246. The Constitution, Article 8, Section 5, provides for county commissioners, but does not attempt to prescribe their "powers, duties and compensation." These, the Constitution says, "shall be prescribed by law." Thus, generally speaking, the power and authority of such officials is only such as have been or may be conferred by legislative enactment. Bowden v. Ricker, 70 Fla. 154, 69 So. 694; Stephens v. Futch, 73 Fla. 709, 74 So. 805; Escambia County v. Board of Pilot Commissioners, 52 Fla. 197, 42 So. 697. There is nothing in State

v. Walton County, 93 Fla. 796, 112 South. 630, that militates against the validity of this legislation. The question before the Court in that case was whether under the valid statutory machinery set up under Section 1634 to 1666 of the Revised General Statutes of 1920, the citizens and tax payers could by proceedings taken under those statutes, ''make the entire county a unit as one special road and bridge district and thereby obviate the necessity of following the provisions of the statutes in this State authorizing the issuance of county bonds to provide funds for the construction of county roads.''

Such legislation as is now before us recognizes the county commissioners as officers and by the particular Act requires of them an application of their ''power and duty of exercising discretion to issue county bonds for the construction of roads.''

As the Act here in question does not positively command or require the County Commissioners to issue the bonds and levy the taxes to pay them, we are not called upon to here consider whether the Legislature could have done so.

6. As to the insistence that the Act is unconstitutional because it does not give the qualified electorate of the county an opportunity to exercise their discretion or express themselves at an election upon the question as to whether or not the bonds should be issued, or the taxes levied by the County Commissioners for the payment of same, our attention has not been called to any provision of our Constitution which guarantees this right to the voters or tax payers of the county. However much the arguments submitted in behalf of this proposition may appeal to the innate attachment to the political principle of local self-government which has hitherto characterized the people of our State and nation; however strong the reasons advanced might be as an argument in behalf of incorporating the

principle contended for into our State Constitution by way of amendment; this is not the proper forum to decide such questions. It is our duty to take the Constitution as we find it, and if it does not contain any provision which expressly or by fair implication vests the right contended for in the voters or tax payers of the county, as against a legislative act to the contrary certainly this Court has no power to override the legislative will and grant such right. In Cooley on Taxation, 4th ed., Section 416, it is said:

"It is a fundamental idea in a republican government that the people who are to pay the taxes must vote them, either directly or by their proper representatives. State taxes must be levied under laws passed by the Legislature of the State, and local taxes under the votes of the people concerned, or their officers or agents duly authorized. It is true that all local powers must have their origin in a grant by the State, which is the source and fountain of authority. The power to tax is no exception to this general rule. If local powers of taxation must come from the State, it might seem to follow as a corollary that the State could at pleasure withhold the grant and exercise the powers itself. But in the general framework of our republican governments, nothing is more distinct and unquestionable than that they recognize the existence of local self-government, at least to some extent, and contemplate its permanency. Some State Constitutions do this by express terms, others by necessary implication; and probably in no one of the States has the Legislature been intrusted with a power which could enable it to abolish the local governments. Of all the customary local powers, that of taxation is most effective and most valuable. To give local government without this would be little better than a mockery."

While these considerations might move the courts, in doubtful cases, to give a fairly liberal construction to con-

stitutional provisions granting local self-government in general terms or with regard to specific matters, or. a strict construction to those provisions which would tend to limit or impair it, this Court is committed to the doctrine that it should not "declare a statute to be void or inoperative on the ground that it is opposed to a spirit that is supposed to pervade the Constitution, or because the statute is unjust or unwise or impolitic"; that "the law making powers of the Legislature of a State is subject only to the limitations provided in the State and Federal Constitutions, and no duly enacted statute should be judicially declared to be inoperative on the ground that it violates organic law, unless it clearly appears beyond all reasonable doubt that under any rational view that may be taken of the statute it is in positive conflict with some identified or designated provision of constitutional law." State v. Johns, 109 So. 228, 92 Fla. 187.

.To paraphrase somewhat closely an expression used in the case of Mobile v. Kimball, 102 U. S. 691, 26 Law ed. 238, this Court is not the harbor in which the people of a city or county can find a refuge from ill-advised or oppressive legislation (such as the intervenors strenuously charge this to be), but the judicial power can only be invoked when some right under the State or Federal Constitution is invaded. In all other cases, the remedy rests with the people themselves and must be obtained by them through their duly selected representatives.

Certainly there is nothing in our Constitution which expressly or impliedly requires a proposed issue of *county bonds* to be submitted to the county tax payers or electors before they can be authorized or issued; but it is contended that this must at least be done before *taxes* can be levied to pay such bonds. It is true that Secton 5 of Article IX says that "the legislature shall *authorize* the *several coun-*

*ties''* to assess and impose taxes for county purposes. But this does not mean that the legislature cannot authorize the Board of County Commissioners, acting for a county, to exercise this power. Our own organic and general statutory law, considered together, contemplate the existence of a Board of County Commissioners, elected by the people in each county, as the administrative and fiscal representatives of the county and its people. Suburban Investment Co. v. Hyde, 61 Fla. 809, 812; State *ex rel.* v. Walton County, 112 So. 630, 15 C. J. 445, *et seq.* The statutes of this State have long recognized the county commissioners as the tax levying machinery of and for the county. The people of the county do not in any case levy taxes for county purposes by direct action. They select the county commissioners to perform this duty for them. Discretion has long been vested in such board, within reasonable limits fixed by the legislature, for this purpose. Numerous have been the Acts authorizing the county commissioners to levy taxes for specific county purposes without any provision whatever for a vote of the people. If the Constitution permits the legislature to authorize the ''counties'' to assess and impose taxes for county purposes, can it be said that the legislature is without power to authorize the county's representatives, through whom the counties usually act in such matters, to do so? Is not the authorization of the county commissioners tantamount to authorizing the counties themselves? See 15 C. J. 390, 446. But it might be contended, if the ''counties'' only can be ''authorized,'' the commissioners could not act without authority being first received by an election authorizing the levy of the tax. This position cannot be maintained. Boards of county commissioners throughout the State are and have been since Florida became a State, annually levying taxes for various purposes on which there has been no vote of

the people, nor none contemplated by law. Sec. 1475, Rev. Gen. Stats., prescribing the general powers and duties of county commissioners, provides that they shall "apportion and order the levy of all county taxes in accordance with the law, either for specific or general purposes, except where otherwise provided by law." Usually the only instances in our statutes in which a previous vote of the people was required as a condition precedent, has been as to the levy of taxes to pay interest and provide a sinking fund for bonds issued for roads and public buildings; and this condition precedent was a creature of statute—not required by any constitutional provision. Being a creature of statute, this condition precedent could be removed by statute. Thus in County Commissioners v. Pilot Commissioners, 52 Fla. 197, 42 South. 697, a statute requiring the county commissioners to audit and pay the expenses of the pilot commissioners was upheld, though no vote of the people was provided for. Other instances might be cited, but we deem it well settled in this State that the legislature may authorize or require boards of county commissioners to assess and impose taxes for a county purpose or purposes without providing for any previous expression of the electorate. See also 15 C. J. 616; Potter v. Lainhart, 44 Fla. 647, 33 So. 251. Counties, differing in many respects from municipal corporations, are political divisions of the State—governmental agencies created largely for administrative purposes and constituting the machinery by and through which many of the powers of the State are exercised. They are usually created by the Legislature without the consent of the inhabitants and derive their powers from the State, to which they are auxiliary; and the power of the legislature with reference to them is supreme except in so far as it may be limited by the State and Federal Constitutions. Keggin v. Hillsborough County, 71 Fla.

356, 15 C. J. 388, 393, 417, 445. Boards of county commissioners are those officers through whom the county performs its usual functions of government, and constitute *quasi* corporations. Martin v. Townsend, 32 Fla. 318, 13 So. 887; 15 C. J. 445, 447. The Board of County Commissioners is, as a general rule, for all financial and ministerial purposes the county itself. Levy Court of Washington County v. Woodward, 2 Wall. 501, 17 Law Ed. 851; State v. Clark, 4 Ind. 315; McDeomett v. Delaware County, 60 Ind App. 209, 110 N. E. 237; Carder v. Fayette County, 16 Ohio St. 353; Hoffman v. Lake County, 96 Ind. 84, went so far as to hold that, "In legal contemplation the Board of County Commissioners is the county itself." It is not necessary for us to go as far as some of the authorities cited to reach a conclusion on this point. We conclude therefore that under Section 5 of Article IX the legislature can undoubtedly authorize a Board of County Commissioners to assess and impose taxes for county purposes, either with or without a vote of the electors of the county.

7. Paragraph 9 of the answer which was stricken on motion, denies that notice of the intention to apply for the passage of the Act was published as required by Section 21 of Article III of the Constitution. It is well settled in this jurisdiction that the courts have no power, under the language now employed in the Constitution, to inquire whether such notice has been published as required by this section of the Constitution and the legislation thereunder defining the method of making and proving the publication of such notice. To ascertain and decide whether the required notice has been given is exclusively a legislative function and duty, and the passage of a special or local act is a legislative judgment that proper notice has been duly published and that the legal evidence thereof was "established in the

Legislature'' before the bill was passed, and the courts are concluded by such judgment. State *ex rel.* Buford, v. Fearnside, 87 Fla. 349, 100 So. 256; Stockton v. Powell, 29 Fla. 1, text 52-59, 10 So. 688; Rushton v. State, 58 Fla. 94, 50 So. 486; Vann v. State, 65 Fla. 160, 61 So. 323. The case of Horton v. Kyle, 81 Fla. 274, 88 So. 757, is not applicable here, as the Act now under review was passed at a regular session of the Legislature. The remedy for the alleged abuse in respect of local laws lies with the people by change of their Constitution and not by appeal to the courts to usurp a power withheld from them by the Constitution, as is plainly shown by the able opinion of that great jurist, Chief Justice RANEY, in the case of Stockton v. Powell, *supra.* It is not without good reason that this decision has been steadily adhered to for a period of thirty-six years, as a perusal of the opinion, and those following it, will show. There was no error committed in striking this section of the answer.

8. Paragraphs 12 and 24 of the answer of the intervenors attack the validity of the Act upon the ground that it was not passed through the legislature in conformity to the requirements of Section 17 of Article III of the Constitution, providing that every bill shall be read on three several days, unless two-thirds of the members present when such bill may be pending shall deem it expedient to dispense with such a rule, and that every bill shall be read by its sections on its second reading and on its final passage unless on the second reading two-thirds of the members present shall deem it expedient to dispense with such rule, and that the vote on the final passage of every bill should be taken by yeas and nays to be entered on the journals of each House; etc.

Attached to the petition for the validation of the bonds and made a part thereof was a copy of the Act and a copy

of the entries in the journals of the Legislature showing its introduction, progress and passage through and by each House, all duly certified by the Secretary of State. Such journal entries show that House Bill No. 1502, which after adoption became the Act in question, was passed and adopted by each House of the Legislature in accordance with the requirements of Section 17 above referred to.

Paragraph 12 of the answer, however, alleges that the Act, shown by the exhibit to the petition as well as by an exhibit to the answer, was passed ''deliberately and intentionally in open, plain and willful violation of Section 17, Article III of the Constitution of Florida, in that the passage of the same as thereby required was not had and accomplished as required by the State Constitution, in that neither the title of the Act nor the Act itself was read in the House of Representatives, nor were the rules at any time concerning the same waived so as to authorize the passage of the Act nor reading of the same on one legislative day, or so as to authorize the reading of the same by the title only, or so as to authorize the reading of the bill in full on the day it was introduced, nor was there any vote taken on the final passage thereof as expressly required by the Constitution of Florida, so to be, all of which the officials and clerks, and the members of said House of Representatives had full knowledge of such unwarranted and unlawful action in direct violation of said provision of the State Constitution; in consequence whereof said special Act was not passed as required by the Constitution and is therefore ineffectual and void, it being mere 'attempted or log rolling legislation' and not a deliberate and orderly passage of the law as required by the organic law,'' etc.

Section 24 of the answer makes practically the same allegations with the exception that its allegations are not con-

fined to the passage of the bill by the House of Representatives, and the allegation that the clerks, officials and members had knowledge of the unlawful action charged, is omitted.

Neither of these paragraphs of the answer deny that the legislative journals showed that the Act was constitutionally passed, in compliance with the requirements of Section 17, as alleged and set forth in the petition. Therefore under the usual rules of pleading, the answer will be deemed as admitting that the official legislative journals do show such constitutional passage of the Act as is alleged in the petition. The answer on this point is in the nature of a plea in confession and avoidance. It impliedly admits the allegation of the petition that the legislative journals show the passage of the Act as required by the Constitution, but says in effect that notwithstanding what the legislative journals may show, the fact is that it was not so passed; that *per contra* it was passed deliberately, intentionally and knowingly, without complying with the constitutional requirements. The answer nowhere alleges that there was or is anything whatever in the legislative journals showing, or tending to show, the non-compliance with the Constitution which is alleged therein.

Appellants contend that a motion to strike is in the nature of a demurrer and admits all such allegations of the answer as are well pleaded; that therefore the motion to strike the answer in this case admitted the allegations of the answer alleging non-compliance with the Constitution as above set forth. The court below on motion struck both of these paragraphs along with the other paragraphs of the answer. The distinguished Circuit Judge who presided over the proceedings of this cause in the court below participated in the decision of this Court in the case of

Amos v. Gunn, 84 Fla., 285, 94 So. 615, which decision we deem to be determinative of the questions thus presented, and shows that the court below was without error in striking these paragraphs of the answer.

It must be admitted that the case of Amos v. Gunn, just cited, was a well-considered one. As the writer was not then a member of this Court, perhaps he may, without affording ground for criticism, be permitted to say that in his opinion the reports of decided cases in this country, both State and Federal, will be searched in vain to find any case where the important principles and questions involved in that case have been subjected to such brilliant, thorough and searching analysis and treatment as in the case cited. The very fact that the decision was by a divided court, and the views of the minority as well as of the majority freely and vigorously set forth, inclines the reader to the opinion that every angle of the questions involved, and all the pertinent cases bearing thereon, were fully considered, analyzed and reviewed, and that the conclusions reached by the majority are therefore entitled to all the more weight and respect. The cogent reasons leading to and under-girding these conclusions are fully set forth in the report of that case, and require no repetition here. Such of those conclusions as are applicable to this case are briefly as follows:

(a) A demurrer to a pleading admits the truth of all essential matters of fact as are well and sufficiently pleaded, but it does not admit as true allegations or averments of fact which the law would not allow to be proved or that are inconsistent with law.

(b) The invalidity of a statute cannot be proved by the admissions of parties in a cause in which rights are involved under such statute.

(c) Judicial knowledge is confined to the record when

an official act of the legislative department is called in question and such record is authentic and complete in itself.

(d) ''If a document as it appears on file in the office of the Secretary of State is a record of an official act of either or both the executive and legislative departments, then it imports verity, is *prima facie* valid and may not be impeached or discredited by any evidence which is of less dignity, and as the legislative journals constitute the only evidence superior in dignity to the record of the legislative act required by the Constitution to be kept by the Secretary of State it may be impeached only by such journals, and unless they show the irregularities charged, the document stands unimpeached as the record of a legislative act.''

(e) ''As everyone is presumed to know the law, the officials named are presumed to have known what their authority was under the law, but it is alleged that they nevertheless deliberately did that which they were not empowered by law to do, to the end that a public record should be made evidencing a power in the Comptroller to collect a tax upon a certain commodity. This allegation comes very near, if it does not completely, charge the officials named with falsely making a public record. And the court, it is claimed, may take judicial knowledge of the facts to place this imputation of wrong doing upon the Governor and officers of the legislature. The court has no power to take judicial knowledge of a state of facts existing *in pais* that will destroy a public record and leave the public officers, whose duty it is to make records of the transactions of their officers, under suspicion of fraudulent conduct.''

(f) The judicial branch has no power to adjudge a public record of a co-ordinate branch of the State Government ''to have been made in a manner not in conformity

with the rules and regulations of law in the absence of a
specific and unequivocal charge of fraud on the part of the
officials concerned, or the existence of some public record
of equal dignity to show the abuse of authority or violation
of law by them or the forgery of their signatures.''

(g) ''By the record is meant all official acts of the
legislative and executive departments of which any written
evidence was preserved as a memorial of the official acts
and transactions of the office. They constitute public rec-
ords of the two departments of government, and may be ex-
amined by the court 'to advise its judicial knowledge,' but
it will not receive the testimony of witnesses to contradict a
record made by a co-ordinate branch of the government
when in the making of such record the officers were acting
under the sanction of their oaths to obey the requirements
of the Constitution. To such a record the rule of conclusive
preference applies, as discussed by Mr. Wigmore.''

Most of the above propositions are quoted *in haec verba*
from the able majority opinion of Mr. Justice ELLIS, in the
case cited, and their application to paragraphs 12 and 24
of the answer shows so plainly the insufficiency of such
paragraphs, and that the action of the court below in grant-
ing the motion to strike them was free from error, as to
require no further comment.

Suffice it to say that, serious as are the charges made in
the answer against the members, clerks and officials of the
legislature, they do not amount to ''specific and unequiv-
ocal'' allegations of fraud, nor do they purport so to be.
And in the absence of clear and legally sufficient allega-
tions of fraud, we cannot go behind the official legislative
journals, where, as here, they are regular and adequate on
their face to show the constitutional passage of the act, and
permit their impeachment by parol evidence or sustain as
sufficient allegations in pleadings which could only be

proven by parol testimony or by some record of less dignity than such legislative journals. Even a written contract between private parties cannot ordinarily be varied or impeached by mere parol evidence, and to set a precedent that would permit the impeachment of official legislative journals by parol would open a veritable Pandora's box of evils more serious even than those of which the appellants so ably and plausibly complain.

9. It is further contended that the act is unconstitutional on its face, because it shows that the large part of the proceeds of the bonds is to be used for a purpose other than a county purpose, i. e., for the construction of State roads, in violation of Section 5 of Article IX of the Constitution. In support of this insistence, appellants stress the fact that in the body of the act, after the clause providing that "the proceeds of the sale of the bonds shall be used for the purpose of constructing, improving and rebuilding the following described roads and bridges, to-wit:" there follows the words in the middle of the page in capitals, "STATE SYSTEM OF ROADS," under which heading comes the description of such roads and the amount allocated to them, aggregating $1,050,000, after which there is another capitalized sub-heading in the center of the page, "COUNTY SYSTEM OF ROADS," under which the county roads are listed and described, to which $200,000 is apportioned.

But this is not sufficient to show that the act is unconstitutional on its face. That part of a State road located within a county may, as to such county, constitute a "county purpose" within the meaning of Section 5 of Article IX of the Constitution. Cotten v. County Commissioners, 6 Fla., 610; Skinner v. Henderson, 26 Fla., 121, 7 So. 464; Stockton v. Powell, 29 Fla., 1, 10 So. 688, 15 L. R. A. 42; Duval County v. Jacksonville, 36 Fla., 196, 18 So. 339; County Commissioners v. Board of Pilot Commis-

sioners, 52 Fla., 197, 42 So. 697; Rushton v. State, 75 Fla., 424, 78 So. 345; Jordan v. Duval County, 68 Fla., 48, 66 So. 298; Lewis v. Leon County, 91 Fla., 118, 107 So. 146. In the last cited case, it was held that, "A public highway may be a State road, both in name and ownership, but as to that portion which passes through a particular county it may be also, to all practical intents and purposes, and in its beneficent effect, a county road as well." And it was further held that the legislature could authorize a county "to contribute to, or aid in, the construction of a public highway located in and benefiting such county, though the same when constructed was to be owned and maintained by the State." A perusal of that case will show that the resolution of the County Commissioners in listing the roads for which the bonds were to be issued and taxes imposed, referred to several of them as "State Roads," giving their numbers, and it appeared that under the law these roads had been designated by statute as State Roads and would be, when constructed, the property of the State, as is the case here. It became necessary, therefore, in that case to determine whether the construction or aid in the construction of a portion of a State road located in a county could constitute a "county purpose" as to such county within the meaning of the constitutional provision. Manifestly, if this could not constitute such a purpose, a county could not impose taxes for the construction, either in whole or in part, of such a road. And in that connection, it was pointed out that Chapter 8553 of the Laws of 1921, wherein the legislature had authorized any county to contribute to, or aid in the construction of State roads located within such county, amounted to a legislative determination that such was a county purpose. It was then said: "Such an act could be constitutionally operative and applicable, unless perhaps in some exceptional case where it was shown

that such road actually conferred no benefit, either present or potential, upon the county through which it was constructed or in which it was located. This does not render the statute unconstitutional but imposes the duty to enforce it when it may be constitutionally applied." Construing the statute here in question as a whole including its title, in the light of the Lewis case, *supra,* and the cases therein cited, we must conclude that the act, so far as the "county purpose" in question is concerned, is not unconstitutional upon its face.

10. But the appellants go a step farther, and insist that the answer of the intervenors shows the act is nevertheless unconstitutional because the facts alleged therein disclose that this is "an exceptional case" and that as a matter of fact the particular State roads in Walton County named in the Act are not needed by the county and that their construction does not constitute a county purpose. The allegations do not, however, go so far as to charge that these roads will "confer no benefit, present or potential," upon the county; nor are they sufficient to remove this case from the doctrine announced in the Lewis case that expenditures for that part of a State road located within a particular county is, as a general rule, a county purpose as to such county.

We are free to concede that the fundamental principle underlying the decision in the Lewis case is that while the legislative determination is accorded great respect, the question of what constitutes a "county purpose" within the meaning of the Constitution is in the ultimate one for judicial determination in the light of the facts of each particular case. The Legislature cannot arbitrarily and without reason defeat the plain intent and language of the Constitution by authorizing a county to assess and impose taxes for a purpose that "has no legal or practical relation what-

ever to any county purpose." In that case it was held that, as it was a matter of common knowledge that ordinarily a public highway passing through or terminating within a county—whether it be a State road or a county road—is a benefit to such county for the reasons therein mentioned, and hence a county purpose, the general Act providing for county aid to State roads located in the county was constitutional, and should be enforced where it could be constitutionally applied. But this holding was not without an important qualification, it being added that "such an Act could be constitutionally operative and applicable, unless perhaps in some exceptional case where it was shown that such road actually conferred no benefit, either present or potential, upon the county through which it was constructed or in which it was located." And again, it was said in the same paragraph: "But the legislative construction of the Constitution to the effect that county aid to State road construction constitutes a county purpose, is entitled to such weight as to require allegation and proof showing the contrary, to overturn or prevent the applicability of the statute in any given case." It was also pointed out that in a former case this Court held that, "No certain rule can be prescribed by which to determine when a work of internal improvement shall be deemed to be embraced within the meaning of the phrase 'county purpose,' as used in the Constitution, and that neither the locality of the work within the county nor the anticipated benefit to be derived from it by the county, is of itself a certain test, but that, if furnishing a general rule, the concurrence of the two would seem to be required." It thus appears that the determination as to what purposes of taxation constitute "county purposes" must be worked out by the gradual process of judicial exclusion and inclusion.

But the legislative determination is entitled to great weight, and, in the case of roads, is from the very nature of the subject, difficult to be set aside; for the question whether a particular road will or will not prove a substantial benefit to the county is one the determination of which usually involves matters of opinion and judgment. In fact, this Court has never, in any case that the writer recalls, had occasion to over turn a legislative determination as to what constitutes a county purpose. All reasonable presumptions will be indulged in favor of the constitutionality of a legislative act. And with regard to such an Act as the one here under review, this general presumption of constitutionality is reinforced by the matters of common knowledge, adverted to in the Lewis case, respecting the benefits which usually flow from improved public highways to the counties through which and in which they are constructed. In County Commissioners of Escambia County v. Pilot Commissioners, *supra,* this Court, speaking through Mr. Justice WHITFIELD, said: "When an expenditure demanded to be made from the funds derived by a county from taxes assessed and imposed by it by virtue of legislation under the Constitution, is or is not for a county purpose, is to be determined by the courts from the facts and circumstances of each particular case; but when an expenditure is authorized by the Legislature as a county purpose, the court will not interfere *except in cases free from all reasonable doubt.*". (Italics ours.) And in Jordan v. Duval County, *supra,* it was held by this Court, speaking through the same eminent jurist, that: "The Constitution does not amplify the term 'county purposes' for which counties may be authorized to 'assess and impose taxes,' and the Legislature, in exercising its appropriate law-making functions, may determine what is a 'county purpose,' and the courts are not authorized to render such

determination ineffectual, unless some provision of the Constitution is violated, or *unless the particular enactment can have no legal or practical relations whatever to any county purpose.*'' (Italics ours.) This case is cited in Cooley on Taxation, 4th ed., Section 119, wherein that noted author goes so far as to say: ''Where 'county purposes' is not defined in the State Constitution limiting the power of the Legislature to delegate to counties the power to tax, to taxes for county purposes, the Legislature has power to define what is a county purpose. Among the purposes for which it has been held that a county may levy a tax for its use, as being for a county or corporate purpose, are * * * roads and bridges,'' etc.

Let us turn now to the answer of the intervenors and consider the facts alleged which are relied upon as sufficient to make this case an exception to the general rule laid down in the case of Lewis v. Leon County, *supra.* The most formidable attack is made against State roads numbers 10 and 110, which have been designated by the Legislature, though as yet unconstructed, and which traverse from east to west the southern portion of the county, the former running along the north shore of Choctawhatchee Bay, and the latter along the peninsular jutting out from the southeastern part of the county and extending westward beyond the western boundary of the county and which separates the bay from the Gulf of Mexico. It is alleged that State Road No. 10, to which the Act allocates $250,000, runs through a territory just north of the bay of wild and unoccupied lands, the assessed valuation of which is only $281,000, and containing no tax payers and citizens to be subserved that would reasonably require any such large expenditure; that in that territory there are only the villages of Bruce, Freeport, Portland and Bolton; that Bolton is a small turpentine camp with not exceeding one hundred

citizens, having no products to be handled except turpentine products which are handled over the bay and water courses; that at Portland there are not more than fifty residents, with no products but turpentine and timber, which are similarly handled; that at Freeport there are not over two hundred citizens, and at Bruce not over fifty citizens, with similar products handled in much the same way; that Road No. 110 is 27 miles shorter, will get most of the through traffic, leaving little but local traffic for Road No. 10, and the local traffic does not justify it; that therefore the construction of such a road at such expense across said territory is therefore unreasonable and arbitrary and not required by any present or proximate future needs of the territory and people to be subserved. That Road No. 110, to which the Act authorizes the allocation of $200,000, which is to run east and west through the peninsular of the county, is to be a part of the "Gulf Coastal Highway"; that such purpose is a National and State purpose and not a county purpose; that this road is to be a through or trunk line road along the Gulf coast from Pensacola to Tampa; that there are not exceeding three hundred residents and citizens on said peninsular, and the assessed valuation for 1927 of all the property therein was only $232,000, and that there is no possible reasonable, practical present necessity for said road to accommodate the present or proximate future needs of the public in said community, or of any other part of the county, and that the construction thereof is unreasonable and arbitrary and constitutes an unwarranted abuse of the taxing power, etc. It is further alleged that Walton county comprises 677,120 acres, only 30,000 acres of which are in cultivation; that it has no tourist business of any commercial value; that the assessed valuation of said county is decreasing rather than increasing, due in part to the excessive valuations of the boom

year and to the cut-over lands from which the timber has been cut and removed, which cutting is being continued rapidly; that with the roads now constructed of sand and clay, and which at present connect the cities, towns and villages of the county, the present traffic is justly and properly accommodated when compared to the present or proximate future financial condition and the public needs and requirements, and that with the revenue available these can be maintained in sufficiently good condition to accommodate the automobile traffic between the cities, towns and villages of the county.

Looked at from one view point, that of what is indispensably necessary to maintain the *status quo,* this is a very strong showing. But there is another side to the picture, and one which we must presume the Legislature took into consideration, and that is, as to what is reasonably necessary to improve conditions and increase the prosperity and general welfare of the people of the county. In Getzen v. Sumter County, 89 Fla., 45, 103 So. 104, it was observed by Mr. Justice WHITFIELD, speaking for this Court, that: ''Large areas, small populations and low valuations may warrant a policy of liberal bond issues for constructing hard-surfaced roads as essential in developing the varied and extensive resources of the county, but such conditions and policy will not justify an excessive bond issue involving an abuse of the taxing power,'' etc. Among the factors which the Legislature might have considered, and which in deference to a co-ordinate branch of the State government, we must presume they might have taken into consideration, are as follows: That the county has been practically denuded of its timber growth, which has hitherto been a principal natural resource; that its agricultural development depends largely upon improved means for vehicular transportation within the county, and for ingress

and egress; that there are no first-class modern roads in the county except State Road No. 1, which was constructed through the county by the State Road Department at no cost to the county; that the county has extensive frontage on the Gulf of Mexico and Choctawhachee Bay, which, without this contemplated system of roads is practically inaccessible; that the system of roads as outlined in the Act will afford free access to the county from other counties and other states,—to its water frontage, its fertile lands, and tend to promote the development and increase the values of the county to such an extent as to fully justify the contemplated expenditure. Some such considerations as these may have influenced the legislative determination that this Act is for a legitimate county purpose. And in a matter of this kind, which depends so largely upon opinion and judgment as to what will, or will not, prove a benefit to the county, would the court below, or this Court, be justified in substituting its opinion and judgment for that of the law-making body? We think this question is clearly answered in the negative by the following excerpt from the opinion of Chief Justice RANEY in the case of Stockton v. Powell, *supra*:

"Even if we were without more direct authority upon the question, it would seem difficult to hold that the improvement of the St. Johns river within the limits of Duval county is not a county purpose. The river is a highway, a means of travel and transport useful to the local interests of the people of the county, and to our minds clearly within the local purpose for which counties and their governments are created. That the commerce and business on the river local to the county is small, or, in our judgment, of 'no importance,' does not change the character of the river or its improvement as a county purpose, nor affect the power of the Legislature to authorize the improvement, or of the

county authorities to make it in the manner prescribed. The function of the judiciary is to confine the Legislature and the county authorities to the limits prescribed by the Constitution, and not to control the exercise of any discretion that may be within such limits. That we might think the establishment of an ordinary road, or the widening or other improvement of an old one, or other exercise of firmly established instances of power, entirely unnecessary, or the improvement now in question unadvisable, can not justify a usurpation upon our part of legislative or executive functions; and the same principle must control our action when we are urged to interfere on the ground that the subject of the improvement, or its result, may be of greater benefit to foreign interests than to those local to the county. That a river may be used more for intercourse and commerce between counties, or even states, than for that which appertains simply to the county proposing to improve it, and that its improvement will redound in a greater degree to the benefit of those engaged in such foreign transportation and traffic, is no stronger argument against the improvement of the river within the county than it would be to urge as a reason for not making or improving an ordinary road, that the travel and carriage upon it affecting interests beyond the county or by persons not resident in the county, would be more extensive than the local travel or carriage.''

We think the above quotation meets all the arguments advanced in behalf of appellants and makes it plain that none of the facts alleged in the answer were sufficient to overcome the legislative determination that the expenditures for these State roads in Walton county as contemplated by the Act would be, for that county, a county purpose.

11. The contention is further made that the title of the

Act is either defective or is not broad enough to cover the provisions as to State roads numbers 33 and 110, because these roads are not located wholly within Walton county, nor is there anything in the body of the Act which requires the funds apportioned to these roads to be expended only upon those parts constructed in Walton county. It is true that the reference to these roads in the body of the Act does not expressly or by description of control points limit them to that part of the roads located in the county. But this ambiguity is cleared up and the legislative intent made plain by the title of the Act. The title shows that the bonds are authorized "for the purpose of constructing, improving, repairing and rebuilding certain roads and bridges in Walton county," etc. It is well settled that the title or preamble of an act may be resorted to, to aid in the construction of the act, when any ambiguity exists. Coosaw Mining Co. v. South Carolina, 144 U. S. 550, 36 Law ed. 537, 12 S. Ct., 689, and other cases cited in 36 Cyc. 1134, and 26 Am. & Eng. Encyc. Law, 2nd ed., 628. On page 629 of the last work cited, it is said: "Especially may the title be consulted as an aid to interpretation where, as is the case in many states, the Constitution provides that the subject of the act shall be expressed in the title, for under such constitutional provisions, the title becomes a part of the act itself, and, upon the principle that an act will not be construed into unconstitutionality if another construction is possible, may be a limitation upon the enacting part of the law." In *ex parte* Knight, 52 Fla. 144, 41 So. 786, this Court said: "The title is a part of the act, and should be construed as such in determining the subject designed to be regulated by the act." In State v. Yeats, 74 Fla. 509, 77 So. 262, it was held that the title of an act may serve to aid in the construction of the body of the act, and as evidence of the legislative intent. And it is of course elemen-

tary that in construing any provision of an act, the whole
statute may be considered in order to determine the legis-
lative intent, and this being found, the courts should so
construe the statute, if possible, as to effectuate rather than
defeat the object which the Legislature had in view when
it adopted it. We think, therefore, that if the entire stat-
ute be looked to, including the title, it sufficiently appears
that the proceeds of the bonds were only to be applied to
the construction and improvement of those county roads
and those portions of the State roads referred to therein
which are within Walton county. In fact, this question
does not appear to have been raised in the court below, but
it is referred to in one of the briefs. Our conclusion is also
supported by the well established rule that when a con-
struction may be fairly placed upon a statutory provision
which is in harmony with the organic law, such construc-
tion will be adopted rather than one which runs counter to
the Constitution, the presumption being indulged that the
Legislature intended a constitutional enactment. Burr v.
Fla. E. Coast Ry. Co., 77 Fla. 259, 81 So. 464; Fla. E.
Coast Ry. Co. v. State, 79 Fla. 66, 83 So. 708.

A somewhat similar contention is made with reference
to that part of the statute which provides that when the
bonds have been sold, the County Commissioners shall turn
over to the State Road Department the sums allocated to
State Roads Nos. 10 and 110. This provision is preceded
by one which follows the description of the State roads,
and which reads: ''Said roads, bridges and drainage struc-
tures shall be constructed on specifications furnished by
the State Road Department and all contracts let and con-
struction done shall be done with the approval and under
the supervision of said State Road Department, when an
agreement with the State Road Department has been made
to accept said roads, by projects, when completed, accord-

ing to the specifications, for the maintenance; and said State Road Department is hereby authorized to enter into such agreement, with said Board of County Commissioners.'' When this special act was adopted, there was already on the statute books a general law, Chapter 8553 of the Laws of 1921, referred to in the case of Lewis v. Leon County, *supra,* providing that counties and special road and bridge districts might aid in the construction of any State or State aid road, by contributing cash or bonds, and authorizing the State Road Department to enter into agreements with the Boards of County Commissioners of the several counties in that regard, and that: ''In case any such aid or contribution is given or made by any county or special road and bridge district such aid or contribution shall be used and employed by the State Road Department only in the construction or maintenance of such State or State aid road or roads in such county or special road and bridge district as shall be designated and agreed upon by and between the State Road Department and the officials of said county or special road and bridge district empowered by law to act in the premises.'' This being the settled policy of the State, by legislative enactment, the provision of the special act for turning over to the State Road Department, under whose supervision the contracts were to be let and the work done, the sums allocated to State Roads 10 and 110, was but incidental to the primary purpose of the Act as expressed in the title and germane thereto. Such payments under the general law the Road Department is obligated to expend only on such portions of the roads designated as are located within the county—which indeed is the evident intention of the special Act itself, when construed as a whole. This is not unfair to the county, as the funds are to be used in constructing roads in the county, and, when constructed, the Road Depart-

ment relieves the county of a considerable burden by taking over the expense and responsibility of maintenance. See Skinner v. Henderson, 26 Fla. 121. "It is presumed that the Legislature, in passing a statute, acted with full knowledge of the constitutional scope of its powers; of prior legislation on the same subject, and its construction by the courts, and executive officers; and with full information in regard to the subject matters of the statute; that it acted from honorable motives; that it did not intend to overthrow long established principles of law, or to give its enactments an extra-territorial operation." 36 Cyc. 1135, citing among other cases, Wilson v. State, 50 Fla. 164, 39 So. 471. The contention that this feature of the Act is an unconstitutional regulation by special act of the jurisdiction and duties of a class of officers, has already been dealt with, and as to the present insistence that it is not within the purview of the title of the Act, it cannot in our judgment be sustained.

While the Constitution requires that each law shall contain "but one subject and matter properly connected therewith," it is the *subject,* and not the matter properly connected therewith, which must be. "briefly expressed in the title." State v. Vestel, *supra;* Amos v. Mosley, 74 Fla. 555, 77 So. 619; County Commissioners of Duval County v. Jacksonville, 36 Fla. 196, 18 So. 339. In the last cited case, it was said on page 224: "It is not essential that the title . of an act should give a synopsis of all the means by which the object of a law is to be accomplished in the provisions in its body."

12. It appearing that the Legislature had the power to pass such an act as this, and that as to its form and manner of passage it has not been shown to be unconstitutional, we come to consider the final contention that the statute, and the action of the Board of County Commissioners pur-

suant thereto, constitutes such a flagrant abuse of the legislative and taxing power, in derogation of the rights of the intervening tax payers under the State and Federal Constitutions, as to require this Court to annul the Act and the action taken thereunder, and set them aside.

In support of this contention, reliance is had upon the facts alleged in the answer, which are briefly as follows: That intervenors are tax payers on property in the northern part of the county, the assessed valuation of which aggregates nearly $400,000; that this property will not be benefited by the construction of the roads across the southern part of the county; that the total assessed valuation of property in Walton county for 1926 was $3,714,104.00, and for 1927 $3,452,660.00; that the assessed valuation is decreasing rather than increasing, on account of the cut-over lands from which the timber has been cut, which is being continued rapidly, and on account of the assessment for the "boom year" being excessive; that the tax levies are already burdensome; that the State and county levies for 1927 amount to 7½ mills, and for county and districts 47 mills; that the construction of said roads and bridges in the principal sum of $1,250,000.00 would add to the already oppressive and excessive tax burden of the county tax payers additional tax contributions to such an excessive amount, for a cause not warranted and not required for the general county good and welfare and not desired by any substantial number of the tax payers, and such action would be unreasonable and arbitrary, and therefore a denial of due process of law to intervenors as tax payers of the county, and also a denial to them of the equal protection of the laws, and would deprive them of their property without just compensation. That the County Commissioners had also passed a resolution to issue $300,000.00 of toll bridge bonds, which they had been authorized by legislatitve act to issue, and

had by their attorney filed a petition for their validation; that while they had subsequently revoked and rescinded this action, and also similar action as to $40,000.00 of jail bonds, intervenors are informed and believe that this action was not taken in good faith, but was done to reduce the amount of bonds to be issued so that the same would come within the limitation authorized by the case of Getzen v. Sumter County, 89 Fla. 45, and that said board intends to renew their efforts to issue and have validated said jail bonds and toll bridge bonds. That the Quarterly Bulletin of the Department of Agriculture shows that the agricultural, fruit and poultry products of Walton county amounted in all to $659,599.00. (The year is not alleged; nor is the annual value of timber and turpentine products shown.)

The question of whether the contemplated roads or any of them will or will not confer direct or special benefits upon the property of the intervenors, is not the proper test of the validity of the contemplated tax, in a case of this kind. We are here dealing with a governmental unit—the county—not a special tax road district. If a public road will be a benefit to the county as a whole, or to any substantial part of the county where the same may be located, the failure of such road to benefit either directly or indirectly the property of individuals situated in some other portion or portions of the county, would not prevent the road from being a legitimate county purpose, for which the county, a constitutional unit, could levy an *ad valorem* tax on all the property in the county. Cooley on Taxation, 4th ed., Secs. 89 and 119, and cases cited; Skinner v. Henderson, 26 Fla. 121; Lewis v. Leon County, *supra.*

That the assessed valuations for 1927 were somewhat less than for 1926, is not a sufficient reason for setting aside

the action of the Legislature and the County Commissioners, has already been shown.

Whether the County Commissioners did or did not intend hereafter to undertake to issue the $340,000.00 of additional bridge and jail bonds, the fact remains that on this record their resolution not to issue them stands unrescinded. Therefore the amount of those bonds is laid out of the case and the time to question whether they will put an unconstitutional burden upon the tax payers is relegated to the future, when, if ever, the County Commisioners may undertake to issue such bonds.

Nor are the ''desires of the tax payers'' material to the inquiry here. The desires of the tax payers are supposed to be expressed through their representatives in the Legislature. It is only their constitutional rights which this Court can protect. And as the tax payer is the burden-bearer of government, he is entitled to all the protection which the Constitution guarantees him. As against a legislative act, the courts can grant him no more; they should certainly accord him no less.

The answer nowhere alleges that the roads involved would not cost the amounts allocated to them, nor does it deny expressly or by inference that the actual values of the property of the county are in excess of the assessed values. We think the courts may take judicial notice of the fact that property in this State is usually assessed for purposes of county and State taxation at values considerably less than actual values. At any rate, there is one of the exhibits attached to the answer, page 106 of record, a financial statement apparently published by the County Commissioners in connection with the notice of sale of the bonds, indicating that such was the case in Walton county, which statement estimates the actual value of real and personal

property within the county at $15,000,000.00, and the correctness of this estimate is not denied in the answer.

Under the principles announced in the case of Getzen v. Sumter County, 89 Fla. 45, 103 So. 104, the only justiciable question presented by this phase of the answer attacking the validity of the act, is whether the resultant tax burden, as it affects property rights protected by the State and Federal Constitutions, is, in the light of the facts pleaded, such an abuse of the legislative power to tax, and of the discretion of the County Commissioners, in exercising the authority expressly conferred by the Legislature, as to amount to a violation of the rights of the tax payers of Walton county under the organic law. Just when a county bond issue made for a county purpose may be held invalid, where made pursuant to an Act of the Legislature, because of objection to the amount of the tax necessary to pay the interest and sinking fund, presents a hard question which it is not necessary for us here to decide. In Getzen v. Sumter County, *supra,* it was held that that point had not been reached where a county bond issue made the amount of bonded indebtedness of the county a fraction more than forty per cent of the amount of the total assessed value of the property in the county. Here, the amount of bonded indebtedness as compared with the total assessed valuations of the county is about 35 per cent, which is considerably less than in the Getzen case. And in the Getzen case the County Commissioners were not expressly authorized by the Legislature to issue the bonds, as here, but the issuance and amount of the bonds was fixed by the County Commissioners in the exercise of their discretion under the general statute, subject of course to ratification by the electorate. So, manifestly, applying the principles announced in, and the precedent set by, that case, the point of invalidity on the ground of unconstitutional abuse of power was not reached

in this case. The facts alleged in the answer are not sufficient to show such abuse of power.

It is of course well settled that the courts are not concerned with the wisdom or policy of statutes, and possess no veto power; and that no duly enacted law will be stricken down by the courts unless it conflicts with some designated provision or provisions of the State or Federal Constitutions. The answer in this case sets forth no facts which would authorize the court to hold that the act under review, or the action of the county commissioners pursuant thereto, is in conflict with any of the designated constitutional provisions, such as the due process clauses, the clauses prohibiting the taking of private property without just compensation, or the denying of the equal protection of the laws.

Counsel for the county earnestly contends that, assuming that a point may be reached where the weight of taxation is so great that the courts would declare an act authorizing a county bond issue to be invalid, it can never apply except where the resultant tax amounts to confiscation— the taking of private property for public use without compensation; that it is not enough, to warrant the exercise of this power, for the courts to find that the statute is merely unreasonable or oppressive or arbitrary; that the legislative power as to taxation is so broad, it cannot be annulled by the courts because of the burden imposed unless that burden reaches the point where it becomes confiscation instead of taxation. Citing Bronson v. Bush, 251 U. S. 182, 64 Law ed. 215; Parsons v. District of Columbia, 170 U. S. 145, 42 Law ed. 943; Spencer v. Merchant, 125 U. S. 345, 31 Law ed. 763; Lainhart v. Catts 73 Fla. 735, 75 So. 56; Henderson Bridge Co. v. Henderson, 173 U. S. 592, 43 Law ed. 823; McCray v. U. S., 195 U. S. 27, 49 Law ed. 78; Mobile County v. Kimball, 102 U. S. 691, 26 Law ed. 238;

Houck v. Drainage Dist., 239 U. S. 254, 60 Law ed., 266; and other cases. We do not, however, deem it necessary to go farther in this case than to say that no confiscation of private property is shown by the facts alleged in the answer.

On the other hand, appellant contends that the facts alleged in the answer are sufficient to annul the Act, under the principles laid down in Getzen v. Sumter County, *supra;* Willis v. Special Road and Bridge District, 73 Fla. 446, 74 So. 495; Consolidated Land So. *et al.* v. Tyler, 88 Fla. 14, 101 So. 280; Paul Bros. *et al.* v. Bridge District, 83 Fla. 706, 92 So. 687 Myles Salt Co. v. Board of Commissioners, 239 U. S. 478, 60 Law Ed., 392; Kansas City S. R. Co. v. Road Imp. Dist. No. 6, 65 Law ed., text page 1157; Kansas City S. R. Co. v. Road Imp. Dist. No. 3, 69 Law ed., text p. 342; McSwain v. Special Road and Bridge District, 81 Fla. 565, 88 So. 479; Norwood v. Baker, 172 U. S. 269, 43 Law ed., 443; Gast Realty and Imp. Co. v. Schneder, 240 U. S. 55, 60 Law ed. 523; Keen v. Jefferson County (Ala.) 33 So. 437, and other cases. With the exception of the Getzen case, which we have already considered, we cannot extend this opinion, already too long, by a discussion of these cases, most of which are special tax district cases. We. do not, however, find anything in them to warrant any departure from the principles herein enunciated.

In our consideration of the important questions involved in this case, we have been greatly aided by the very able arguments, both oral and written, of the distinguished counsel on both sides.

We find no error in the record and the decree overruling the demurrer, striking the answer of the intervenors, and validating the bonds is hereby affirmed.

Affirmed.

TERRELL AND STRUM AND BUFORD, J. J., concur.

ELLIS, C. J., AND WHITFIELD, J., dissent.

WHITFIELD, J. (dissenting) :

The title of the special or local Act is misleading in that it expresses the subject of the Act to be to authorize the Board of County Commissioners of Walton County, Florida, to issue and sell bonds "for the purpose of constructing, improving, repairing and rebuilding certain roads and bridges in Walton County, Florida," while the body of the Act provides for the "construction, including necessary bridges, drainage structures, engineering and supervision costs of" designated "State Roads" under a caption of "State System of Roads," as well as provides for "constructing, improving, repairing and rebuilding" designated roads under a caption of "County System of Roads." There is nothing in the title to indicate that the body of the Act provides for the construction of State Roads as distinguished from County Roads. This distinction is very material in view of the organic command that counties shall be authorized to impose taxes for county purposes "and for no other purposes," and in view of the statutory provision that the designated roads with others "shall be and constitute the system of State Roads of this State, and when located and constructed by the State Road Department shall become and be the property of the State." The misleading feature of the title of the special Act is given further emphasis in that the body of the Act provides that the location of the State roads shall be as determined by the State Road Department, and that the roads, bridges and drainage structures shall be constructed on specifications furnished by the State Road Department, and all contracts let and construction done shall be with the approval

and under the supervision of the State Road Department, under agreements with the State Road Department "to accept said roads by projects when completed"; and that when the bonds are sold, the County Commissioners of Walton County shall turn over to the State Road Department the amounts allocated to two of the designated State roads, "anything in this Act, or by provision of law, to the contrary notwithstanding."

Section 24 of Article III of the State Constitution provides that the general laws relating to county government shall be applicable except when inconsistent special or local laws are duly enacted to supersede such general laws. See City of St. Petersburg v. Pinellas County Power Co., 87 Fla. 315, 100 South. Rep. 509. The title of this Act indicates that its subject, object and purpose are to authorize county bonds for county road construction; and there is nothing in the title to indicate that one of the main purposes set out in the body of the Act is to require the County Commissioners of the single county to turn over county road funds to the State Road Department with which to construct State roads, "anything in this Act, or by provision of law, to the contrary notwithstanding." There is nothing in the title to indicate that the body of the Act provides regulations for using the proceeds of county road bonds different from the general law on the subject, and such regulations are not "matter properly connected" with the subject expressed in the title, therefore the title is misleading and the inclusion of such regulations in the body of the Act violates Section 16, Article III of the Constitution, if it does not also violate Section 20, Article III, forbidding special or local laws regulating the duties of officers.

The provisions of the Act that are referred to, not being reasonably and naturally included in the subject expressed in the title of the Act, and not being "matter properly

connected'' with the subject expressed in the title of the Act, the title is misleading, and as to such matters the Act violates Section 16, Article III of the Constitution, which forbids an Act to contain matter not properly connected with a single subject that is expressed in the title, Carr v. Thomas, 18 Fla. 736; if such provisions are not also in violation of Section 20, Article III, and of Section 5, Article IX, and other sections of the Constitution.

Affirmative action by the court in validating the relatively large bond issue might properly be withheld pending further inquiry, in view of the uncontroverted averments of the sworn answer.

The answer avers facts to show that the county already has adequate road facilities for all reasonable county purposes; that the proposed bond issue with other public debts and ordinary expenses of the county, will unduly, unnecessarily and oppressively increase the already heavy tax burdens in the county, and that even if more roads are needed for county purposes, the proposed bond issue is excessive, is an abuse of power, and a violation of the organic rights of tax payers, under the principles announced in Getzen v. Sumter County, 89 Fla. 45, 103 So. 104, and Paul v. Long Branch, &c., 83 Fla. 706, 92 So. 687. The motion to strike admits the truth of the facts averred, and the asserted conclusions have a predicate in specific averments of facts, even though a wider latitude of discretionary action is accorded to a Legislature than to an administrative body. The statute merely authorizes a bond issue by the county for public road construction, ''in an amount not to exceed'' $1,250,000.00, and does not specifically determine the public requirements as to county roads or the amount that is reasonably needed for the several public improvements. The action of the County Commissioners under the statute must be reasonable as well as within the authority conferred, and

such action is subject to judicial review, to prevent abuses of authority and to redress invasions of the organic and fundamental property rights of tax payers.

The State was formed for governmental purposes, and the Constitution is designed not merely to confer official powers but to secure and protect the rights of individuals. Governmental authority is to be exercised for the general welfare within appropriate limitations that are intended for the conservation of private rights. Courts are established to adjudicate justiciable matters to the end that government may be maintained and public and private rights duly effectuated.

The abuse or violation of governmental authority conferred as well as the assumption or exercise of authority not conferred, is a justiciable matter; and the command of the Constitution that "All courts in this State shall be open, so that every person for any injury done him in his lands, goods, person or reputation shall have remedy, by due course of law, and right and justice shall be administered without sale, denial or delay," is made useless if in judicial proceedings averments tending to show an abuse of official authority that violates organic rights, are stricken when they duly present justiciable matters, and this may operate as a denial instead of a rendering of justice by the courts, thereby violating the mandate of the Constitution.

An unreasonable or excessive bond issue, even for a lawful purpose, may be illegal and violative of the rights of tax payers as well as bonds issued without or contrary to authority. If authority is abused the courts will not aid in effectuating the abuse by a judicial validation. Whether a bond issue is authorized and is for a lawful purpose may ordinarily be determined by reference to the written law; but whether a bond issue, though within the stated limits

of authority conferred and for a lawful purpose, is unreasonable or excessive, is to be determined, upon a due consideration of all pertinent facts, by proper authority, subject to appropriate judicial review and adjudication, when organic or fundamental rights are duly asserted to be invaded or violated.

In this case the answer is not wholly irrelevant and immaterial or improper as an entirety, but there are pertinent specific positive averments of facts that afford a predicate for proof of an abuse of authority by an excessive bond issue, to the injury of organic rights of tax payers, the legal sufficiency of the proof to warrant judicial relief being a matter for adjudication, therefore the answer should not have been stricken.

ELLIS, C. J., concurs.

## ON PETITION FOR REHEARING.

BROWN, J.—In its last analysis, the gist of the petition for rehearing is an appeal to this Court to strike down the legislative act here involved because it constitutes a departure from wise public policy. It is contended that the counties and municipalities and special taxing districts, aided by the Legislatures, have of recent years been entirely too extravagant in this matter of creating bonded indebtedness and additional tax burdens, and that it is high time for the courts to call a halt, and that this is a case where the checking up process should begin. Even if the first contention be correct, the second invites the courts to enter the sphere of political action, wherein the wisdom and policy of laws may properly be considered as the basis for their amendment or repeal. The courts are vested with no such power. It is only when a statute plainly conflicts with constitutional provision or provisions that the courts are authorized to strike it down. Even this authority of the

courts was looked upon with great jealousy and distrust by
many of our early leaders, including Jefferson himself.
Notwithstanding the fact that it was inevitably necessary
under our system of government, whereby the Constitution
is expressly made the supreme and paramount law and all
judges are required to take oath to support it, that the
courts should exercise this power, it was for many years
assailed as a usurpation of authority on the part of the
courts. But as the years rolled by, and the conscientious
and restrained, yet faithful and fearless, exercise of this
power on the part of the courts has brought home to the
minds and hearts of our people the deep-seated conviction
that thus and thus only, could the integrity of the Consti-
tution and its priceless principles of government be pre-
served, it came to be seen that what some of our early
statesmen had feared would be a menace to popular govern-
ment has proven to be the balance-wheel of the republic and
its greatest preservative and stabilizing influence. And
this has come about because the courts have been careful to
keep within their proper sphere, scrupulously declining to
invade the domain of the legislative or executive depart-
ments and refraining from nullifying their acts except in
those instances where they were plainly and clearly in con-
flict with constitutional provisions. This commendable judi-
cial self-restraint was evidenced by early rulings to the
effect that the courts would not in any case pass upon the
constitutionality of an act of the legislative department un-
less it was absolutely essential to the decision of the law of
the particular case, and, where necessary so to pass upon
it, would not declare such an act unconstitutional unless
the asserted conflict with the Constitution was clearly
shown beyond reasonable doubt. And in connection with
this traditional determination of the courts not to overstep
the proper boundaries of the judicial department and

enter upon a career of self-aggrandizement by unauthorized extension of their jurisdiction, it is significant that the first act of Congress which was declared unconstitutional by the Supreme Court of the United States was one which attempted to enlarge the jurisdiction of the court beyond the bounds fixed by the Constitution. Marbury v. Madison (U. S)., 1 Cranch, 137. It was also early laid down by the courts as a fundamental principle that the judicial department would not nullify legislative acts merely on grounds of the policy or wisdom of such acts, no matter how unwise or impolitic they might be, so long as there was no plain violation of the Constitution; that to do otherwise would constitute an unwarranted judicial invasion of the legislative power. And yet the courts are frequently appealed to, to make strained and far-fetched constitutional constructions in order to get rid of statutes which are deemed unwise, unfair, or undesirable, and in many cases properly so, but which are not in fact unconstitutional. Whereas there was at first a tendency to criticise the courts for going so far as to declare legislative acts unconstitutional, no matter how plainly shown, there is now a tendency to criticise the courts for not going so far as to exercise a sort of supervisory veto power over alleged unwise, though not unconstitutional, legislation. See Amos v. Gunn, 84 Fla., p. 353. However complimentary the implications of this situation may be to the courts, as evidencing a growing faith and confidence in the judiciary on the part of the bar and the people, the courts must nevertheless resist all blandishments which would tempt them even temporarily to encroach upon the domain, functions and powers of the legislative or the executive departments of the government. It is the function of the judiciary, not to make the law, but to declare what the law is; though in doing so the construction itself becomes as it were a part of the law. This

they should continue to do as fearlessly and as faithfully as in the past. But if the moral force and power—the confidence of bar and people—which is the greatest power of the judiciary (numerically and politically the weakest of the departments of government)—if this is to continue, so that the beneficent and necessary work of the courts may go on, the courts must, in the future as in the past, keep within the proper boundaries of the judicial department, and not seek to meddle with matters which the Constitution has placed exclusively in the hands of the other departments. The courts will find plenty to do, plenty of opportunity for the highest service, plenty of opportunity to exercise the highest courage and finest ability and integrity that God has given them the power to exercise, if they measure up to the opportunity for service to State, Nation and citizenry which is afforded within the proper confines of their own important department of the government. The Constitution of the fathers must continue to be the pole star which guides their way, not only as regards their decisions on the acts of other departments, but also as regards the proper limits of their own sphere of action. Thus, and thus only, will our admirable system of constitutional checks and safeguards, and our Constitution itself, be preserved.

In a case involving assessments of abutting property for street improvements, Guest v. Brooklyn, 69 N. Y. 506, there is a strong passage which has some bearing here. It was there said:

"MARSHALL, C. J., in McCulloch v. State of Maryland (4 Wheat. 428), said: 'The only security against the abuse of this power (the taxing power) is found in the structure of the government itself. In imposing a tax, the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation.' This is true to a degree as it respects general taxation,

when all are equally affected, but it has no beneficial application in preventing local taxation for public improvements. The majority of the constituents would generally approve, certainly not dissent from taxing the small minority.

"The few are powerless against the legislative encroachments of the many. The 'constituents,' under this system, are attacked in detail, a few only selected at a time, and they have no power to enforce accountability, or to punish for a violation of duty on the part of the representative. The majority are never backward in consenting to, and even demanding, improvements which they may enjoy without expense to themselves. The inevitable consequence is to induce improvements in advance of public necessity, to cause extravagant expenditures, fraudulent practices, and ruinous taxation. The system operates unequally and unjustly, and leads to oppression and confiscation. It is difficult to discover in it a single redeeming feature which ought to commend it to public favor. I make these observations to enable me to say more impressively, that the effective remedy is not with the judiciary. Whatever our individual views may be of the policy, we are obliged to maintain established rules of law, and to restrain our own power within prescribed limits, as well as to enforce restrictions upon other departments of government. We should regard a departure by the courts from rules of law wisely established for the protection of all, to meet the equities of a particular case or class of cases, as a far greater evil than that sought to be remedied. Courts can confine the legislature within constitutional authority; and, when the questions are legitimately up, can and do exact a strict compliance with all the requirements of law leading to a forcible taking of the property of the citizen, but beyond this they have no discretion, and are themselves

bound to observe and enforce legislative provisions, whether they approve them or not. The only effective remedy is with the legislative department of the government, and it may possibly have been before applied but for the existence of other more engrossing abuses affecting the whole people; but among the manifold evils complained of in municipal administration, there is no one, in my judgment, calling more loudly for reform than this arbitrary system of local assessments.''

Perhaps this Court has, in the Getzen case, gone as far as constitutional principles will permit in outlining the limitations upon the taxing power in cases of the kind now before us. But, as already pointed out, under the principles enunciated in the Getzen case, the decree of the court below validating bonds, must stand affirmed.

The petition for rehearing must be denied.

TERRELL, STRUM AND BUFORD, J. J. concur.

ELLIS, C. J., AND WHITFIELD, J., dissent.

ELLIS, C. J., AND WHITFIELD, J. (dissenting) :

In our judgment a rehearing should be granted upon the grounds that the special or local Act violates organic law and that the entire answer should not have been stricken.